[No. S024471. May 8, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL GREGORY WATSON, Defendant and Appellant.

654

## Counsel

Lynn S. Coffin and Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, and Peter R. Silten, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Carol Wendelin Pollack and Pamela C. Hamanaka, Assistant Attorneys General, William T. Harter, Susan Lee Frierson, April S. Rylaarsdam, John R. Gorey and Nancy G. James, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MORENO, J.**—Defendant Paul Gregory Watson was convicted of two counts of first degree murder (Pen. Code, § 187, subd. (a))[1] with multiple-murder special-circumstance findings (§ 190.2, subd. (a)(3)). The jury found that defendant was armed with and personally used a firearm in the commission of the offense. (§§ 12022, subd. (a), 12022.5, subd. (a).) At the penalty phase, the jury returned a verdict of death.

The trial court denied defendant's automatic application to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise noted.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution's Case*

##### a. *The Shooting*

During early 1989 in Compton, California, the Atlantic Drive Crips were "at war" with the Santana Block Crips. On the afternoon of Sunday, April 2, 1989, a large group of people were passing the day at Compton's Kelly Park.[2] The individuals in the park that day included members of the Atlantic Drive Crips and their allies, the Kelly Park Crips and the In Hood Crips. By early evening, between 100 and 150 people, most of whom were barbecuing, listening to music, and playing basketball, remained in the park.

That evening, Timothy Martin was talking with a friend in front of the Alondra Apartments when he noticed a white Cadillac, followed by another vehicle, traveling westbound on Alondra Boulevard toward Castlegate Avenue. The vehicles aroused his suspicion because there were "too many people in both cars." He was also alarmed because he believed the occupants to be members of the Santana Block Crips. Martin rode his bicycle to the park to alert his brother to the potential danger.

After talking to his brother, Martin rode to his house on Castlegate Avenue, south of Caldwell Street. While Martin stood in his driveway talking to another friend, he saw the same white Cadillac stop at the corner of Castlegate Avenue and Caldwell Street. The front passenger, whom Martin identified as defendant in a photo lineup and at trial, was seated on the door rail, holding an AK-47 rifle over the roof of the car and aiming at Martin. The Cadillac then continued toward the park, and five or six seconds later Martin heard about 20 gunshots. A reluctant witness, Martin had received threats to his life from unidentified persons if he testified.

Terry Fennell, who was associated with the Kelly Park Crips, was in the park playing basketball about 6:00 that evening. After finishing a game, he walked to his car on Butler Avenue to get a towel. As he returned to the park, he noticed Tammy Eldridge and Ava Williams sitting in a black Toyota Celica parked in front of the Compton Police Department substation on the north side of Caldwell Street, with their three young children in the car. Eldridge

---

[2] Kelly Park is bordered to the north by Alondra Boulevard, to the west by Castlegate Avenue, to the south by Caldwell Street, and to the east by Harris Avenue.

and Williams were talking with Earl Solomon, a member of the Atlantic Drive Crips. A white Cadillac with three occupants was traveling westbound on Caldwell Street; Fennell recognized the Cadillac as belonging to defendant. When Fennell reached the sidewalk on the north side of Caldwell Street, 20 feet from the Cadillac, he saw an AK-47, held by defendant, come out of the window. Defendant leaned out of the front passenger window of the Cadillac and shot into the park. Fennell ducked behind a parked car and continued to watch defendant. The Cadillac passed Eldridge's Celica; defendant turned back toward the Celica and continued shooting, hitting Solomon in the head. Fennell could not remember if any cars were following the Cadillac.

Fennell was standing about 35 to 40 feet from Solomon when Solomon was shot. He went directly to Solomon's body while Eldridge started her car and drove away down Butler Avenue. Fennell was the first to arrive at Solomon's side, and left immediately after confirming he was dead. Fennell later returned to the scene and spoke with police.

Fennell had been convicted of taking a vehicle and receiving stolen property. Fennell's friends in the neighborhood stopped talking with him because they did not want him to come forward and testify. He and his family ultimately were forced to move away from the neighborhood.

Gary Lomax, Fennell's brother-in-law, was also playing basketball in the park at the time of the shooting. His back was to Caldwell Street when he heard the gunfire, and he turned to see what was happening. As he ran for cover, Lomax saw two cars traveling westbound on Caldwell Street. Lomax had seen the two cars pass the park 10 to 15 minutes before the shootings. Lomax testified defendant was leaning out of, and trying to sit back down in, the passenger side of one of the cars, holding what appeared to be a gun.

Between 6:00 and 6:35 p.m., Hermetta Harper, a security officer employed by the City of Compton, was inside the police substation at Kelly Park when she heard about 15 to 20 gunshots coming from the area of Castlegate Avenue and Caldwell Street. Although she could not see what was going on outside, she heard the gunfire moving westward along the south side of the park. When the firing stopped, she saw an African-American male lying in front of the substation bleeding profusely from a gunshot wound to the head. She approached him and found he had no pulse. By this time, police officers were arriving at the park and Harper returned to the substation to report a homicide.

Brian Owens, an associate of the Atlantic Drive Crips, was also in Kelly Park that day. He saw Eldridge and Williams there in his Toyota Celica,

which he had loaned to Eldridge. Hearing gunfire, Owens looked up to see a white Cadillac being driven westbound on Caldwell Street, with a person hanging out of the passenger window. Owens saw the person shoot a rifle into the park, hitting Solomon in the head. He later described the shooter as a light-skinned African-American man wearing a white T-shirt.

After witnessing the shooting, Owens ran to his Chevrolet Cavalier, got in, and chased the Cadillac, armed with a .45-caliber semiautomatic handgun. Some cars that had been trailing the Cadillac moved behind Owens's car and opened fire. Owens could not recall whether he ever fired his weapon. He was hit in the left shoulder and the head; at the time of trial a bullet remained in his head and he was blind in his left eye. His memory of that day's events was impaired. He admitted he could not remember anything after seeing Solomon get shot and had filled in the rest of the events by speaking to other individuals.

About 6:15 on the evening of the shootings, Officer Henry Johnson of the Compton Police Department received a radio call directing him to go to Kelly Park. As his partner drove down Alondra Boulevard, Johnson saw a late model Chevrolet Cavalier traveling in the opposite direction, but he did not see anyone in the driver's seat. Johnson instructed his partner to make a U-turn and follow the Cavalier, which went off the road and came to rest in a flowerbed near the corner of Alondra Boulevard and Ward Avenue. Johnson ran to the Cavalier. Inside, an African-American male (Owens) was lying unconscious across the front seats, his arm extended toward the floor near a blue steel .45-caliber semiautomatic handgun that smelled as if it recently had been fired. Johnson saw three large-caliber bullet holes near the driver's door, a large-caliber bullet hole at the left front fender, and a similar hole at the left rear fender. The rear window was broken out, and in the windshield was what appeared to be a bullet exit hole.

Irma Myricks and her daughter Latrice Nick lived near Kelly Park and were at home on the evening of April 2, 1989. They both heard gunshots and looked out their front door to see a white Cadillac traveling westbound on Caldwell Street. Myricks saw someone hanging out of the car's window firing a gun, and then saw Solomon lying on the sidewalk.

Tammy Eldridge testified at trial that she and Williams were sitting in Owens's Celica parked in front of the police substation at Kelly Park while talking with Earl Solomon, who was standing on the sidewalk on the north side of Caldwell Street. As they talked, Eldridge heard gunshots coming from behind her and saw people running and getting down on the ground. Eldridge tried to shield herself and the children from the gunshots. When the shooting

stopped, she looked up to see a white Cadillac similar to one she previously had seen defendant driving, followed by a dark blue or black car. A medium-complected African-American man leaned out of the passenger window of the Cadillac with what Eldridge believed to be a rifle in his hands. She then heard more shooting and again ducked for protection. Williams's head fell to Eldridge's knee and, when the firing ceased, Eldridge lifted Williams's head, revealing a large bullet wound to her face and causing one of her eyes to fall out of her head. Eldridge replaced the eye and drove away to get help.

Eldridge stopped her car in front of some houses and rushed the children inside someone's home. Williams was not conscious or moving. Eldridge noticed a bullet hole in the windshield of the Celica.

Alisha Dukes lived near Castlegate Avenue and Adana Street near Kelly Park in Compton. On the evening of the shooting, she heard a car's brakes screeching and looked to find a car with broken glass on the passenger side stopped in the street. A hysterical woman jumped from the car. Dukes took a baby from the car and, after summoning help from neighbors, tried to calm the child and clean blood and glass from its head. The adult passenger in the car appeared to be dead.

Henry Williams lived next door to Alisha Dukes. He too heard a car's brakes screeching and saw a woman get out yelling for help because her friend had been shot. Williams called 911. His wife and neighbor cared for the children taken from the car while he attended to the car's adult passenger. The passenger was missing part of her face and, believing her to be dead, Williams covered her with a blanket.

b. *The Investigation*

Compton Police Detective Marvin Branscomb responded to Kelly Park after the shooting and cordoned off the area to protect the crime scene. Terry Fennell identified defendant to Branscomb as the shooter and a member of the Santana Block Crips, going by the moniker "Potato Head." Branscomb obtained a "six pack" photographic lineup containing a picture of Potato Head. Branscomb admonished Fennell that persons involved in the shooting might or might not be depicted in the six-pack and that he should identify only the person he believed to be the shooter. Branscomb then had Fennell examine the photographs, and he identified defendant as the shooter. No other witnesses came forward at the scene.

Branscomb and other officers searched Caldwell Street and located one assault rifle casing and several .45-caliber shell casings.

Branscomb unsuccessfully tried to locate defendant. The next day, Branscomb contacted defendant's sister, Bridgette Norflee, but was still unable to find defendant.

### c. *Defendant's Activities Before and After the Shooting*

Sonya Stone, defendant's former girlfriend, testified she saw defendant on the day of the shooting driving his white Cadillac with several African-American male passengers. Stone explained the Cadillac previously had been painted green.

Tony Carillo managed Color King Auto Painting in Compton, California. On April 3, 1989, he generated a receipt for the painting of a Cadillac with the license plate number 2JYC400. The receipt indicated the work was "exclusively for Paul," and a woman named Bridgette signed the receipt. Color King painted the Cadillac black.

Hazel Adams, a Department of Motor Vehicles registration manager, testified that ownership of a 1977 Cadillac coupe, license plate number 2JYC400, was transferred from Paul Watson to Serita Hutchinson on June 6, 1989, in exchange for $500.

### d. *Defendant's Arrest*

On August 31, 1989, Bakersfield Police Sergeant David Haskins, seeking to locate defendant, executed a search warrant on a Bakersfield apartment. Haskins arrested defendant inside the apartment. Outside, Haskins located and impounded a black Cadillac, license plate number 2JYC400.

That afternoon, Detective Marvin Branscomb traveled to the Kern County jail in Bakersfield and took defendant into his custody. Branscomb also inspected the black Cadillac. He took a paint sample from the vehicle and discovered three layers of paint: green, white, and black. Inside the car, Branscomb located a shell casing.

Branscomb advised defendant of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), which he declined to waive, and transported him to Los Angeles. During the drive, defendant, without being informed of any specific details of his arrest, asked why he was being charged with attempted murder[3] and claimed he was not in Compton on the day of the shooting.

---

[3] The reference to attempted murder evidently related to the shooting of Brian Owens.

e. *Forensic Evidence*

Los Angeles Sheriff's Department firearms identification specialist Edward Robinson testified that a bullet fragment found in the Celica that Eldridge had been driving was consistent with a bullet fired from an AK-47. The bullet recovered by the coroner's office from Williams's brain likely had been fired from an AK-47 or SKS rifle. Robinson was unable to compare the bullet found in the Celica with the bullet found in Williams's brain because the bullets were damaged.

f. *Cause of Death*

Forensic pathologist and chief physician for the Los Angeles County Department of Coroner Lakshmanan Sathyavagiswaran testified that Ava Williams died of a gunshot wound to the head. The bullet traversed her left cheek and entered her nose before coming to rest in the right front portion of her brain. The bullet jacket was located in the base of her skull. Given the damage to Williams's face, the bullet might first have hit something else, such as the car's window. Williams's wounds were consistent with a high-powered rifle.

Dr. Sathyavagiswaran testified Earl Solomon died of a gunshot wound to the head, suffering subarachnoid hemorrhage with massive laceration. The wound was caused by a high-velocity weapon, such as a rifle.

g. *Gang Expert*

At the time of defendant's trial, Compton Police Sergeant Reginald Wright served in the department's gang homicide unit. Wright described the structure of Black street gangs in Los Angeles, the different categories of gang membership, the rivalries between Crips and Bloods and between various Crip sets, and the concept of "payback," or retaliation, between gangs. Wright described the Santana Block Crips as a violent street gang whose hardcore members wear the letters "SBC" on their caps, belt buckles and jackets, or who may have tattoos referring to the gang. Formerly allies with the Atlantic Drive Crips, the Santana Block Crips became embroiled in warfare with them, involving retaliatory shootings, over a bad narcotics deal. Wright knew defendant by his gang moniker Potato Head and knew he was a member of the Santana Block Crips. In Wright's opinion, the murders were gang motivated. Wright also testified that gang members are reluctant to testify against one another, even regarding a shooting of the witness's own "homeboy" by a member of an opposing gang, because they generally prefer "handling their own business" to involving the police.

### 2. Defense Case

#### a. Eyewitness Testimony

Curtis Jones was in Kelly Park at the time of the shootings. Jones was a longtime member of the South Side Compton Crips, allies of the Atlantic Drive Crips. Before the shooting, Jones saw a beige Cutlass and a black Regal being driven past the park; a man Jones knew as Chico (Brian Owens), was chasing the cars in another vehicle. Jones then heard seven or eight gunshots and hid behind a tree for protection. He got only a quick glimpse of the cars as they passed and did not see any of the occupants. Jones did not immediately inform police of his observations and admitted having spoken to defendant while they were both incarcerated in the Los Angeles County jail.

Jones acknowledged having previously been convicted of a felony (joy riding).

James Randle, a "retired member" of the Compton Neighborhood Crips (also known as In Hood) testified he saw the shooting in Kelly Park. He remembered seeing a man in a white car apparently pulling an AK-47 back into the car through the passenger window. The man had brown skin and a blue rag covering his face from the nose down. Randle was friends with defendant and believed the person in the white car had darker skin than defendant. Randle did not come forward with this information until after speaking with defendant in jail.

Randle acknowledged having previously been convicted of felonies.

Unuva Miller also witnessed the shooting at Kelly Park. At the time of the shooting, Miller was near the park on Caldwell Street. She saw a beige car and a black car drive down Caldwell Street. She believed the cars might have been Buicks, Monte Carlos, or Cutlasses. One of the individuals in the beige car was carrying a rifle, but she could not identify the person other than to say he was wearing a black hat. Although Miller had known defendant for five or six years, she did not recognize him as the individual with the gun. Miller testified despite having been threatened by the Atlantic Drive Crips, who accused her of setting up the shooting because she had had a child with a Santana Block Crips member. Miller admitted, however, she was so focused on getting her daughter out of the park that she might not have observed all of the cars involved.

Private investigator Arthur Runnels testified Timothy Martin told him that a person in the Cadillac shot through the driver's side window and that he was unable to identify the shooter.

Joseph Widby was a longtime member of the Atlantic Drive Crips and was friends with Earl Solomon. Widby was in the park at the time of the shooting. He heard gunshots and saw a person leaning out of the window of a white Cadillac holding what appeared to be an AK-47. Widby saw that one of the other passengers in the Cadillac was holding a .45-caliber gun and both individuals were aiming their guns at the park. Widby saw Brian Owens driving a black car behind the Cadillac. Widby had known defendant for several years and testified that he was not the man holding the AK-47—his hair was longer than defendant's and he was skinnier and lighter skinned than defendant. Widby also denied there was a gang war between the Atlantic Drive Crips and Santana Block Crips, instead claiming the story of the feud had been fabricated by police.

Widby testified he would not lie for defendant and did not want an innocent man to be charged with a crime. In addition, Widby testified he was concerned his testimony might offend Solomon's parents because he had been friends with Solomon. Widby also admitted speaking with defendant while incarcerated.

Widby acknowledged he was, at the time he testified, serving a 10-year term in a federal prison in Petersburg, Virginia, on a conviction of being a felon in possession of a gun.

### b. *Police Incompetence*

The defense sought to establish that the police investigation of the offenses was marred by error.

Hermetta Harper, recalled by the defense, testified that Timothy Martin told her what he had seen, but that she did not inform the police until two or three weeks before trial.

Compton Police Officer Ronald Thrash testified he responded to Kelly Park within five minutes of the shooting. Thrash spoke with Terry Fennell at the scene and, according to Thrash, Fennell told him he was standing on the southwest corner of Caldwell Street and Butler Avenue at the time of the shooting, contrary to Fennell's testimony that he crossed to the north side of the street when the shooting occurred. Thrash also admitted he made a mistake in his report as to the location of Earl Solomon's body.

District attorney investigator Adam Khan accompanied the prosecutor, Mark Ashen, to Oregon to interview Gary Lomax. Lomax described to Khan

and Ashen a white or green Chevrolet as being involved in the shooting. Lomax's signed statement, drafted by Khan, stated the car was white. Khan admitted he had mistakenly failed to indicate the car could have been green.

### 3. *Prosecution's Rebuttal*

Los Angeles County Deputy Sheriff Michael Winter testified that while working at the Los Angeles County Men's Central Jail, he was assigned to monitor the gang modules. For a period in 1991, defendant and Curtis Jones were housed in the same module. Deputy Winter further testified that inmates housed in the same modules have access to each other's cells and can spend time together in group areas. He was unsure whether defendant and Jones were ever released to the common areas at the same time.

### B. *Penalty Phase*

#### 1. *Prosecution's Case*

Bruce Bromley testified that, on January 28, 1990, he was incarcerated at Los Angeles County's Wayside Honor Rancho. On that date, Bromley placed a cup of juice on the table where defendant was sitting, and defendant brushed the cup off the table. Bromley told defendant he did not know defendant owned the table. Defendant stood up and looked at Bromley, then sat down again. As Bromley walked away, he was punched from behind. The blow landed on the right side of his face and he was knocked almost unconscious and fell to the ground. As he came to, defendant said, "Don't you ever talk that way to me again," then walked away. The right side of Bromley's face became swollen and he had a black eye.

Bromley acknowledged he had suffered two grand theft convictions.

Brett Hornick testified that, on February 19, 1990, he was incarcerated at Wayside Honor Rancho. When Hornick walked behind the jail's lunch area that afternoon, a blanket was put over his head and he was beaten; $5 was stolen from his sock. After Hornick removed the blanket, he saw defendant running away. Hornick sustained a broken nose, but did not report the assault.

Between 3:00 and 4:00 the next morning, Hornick saw defendant and three other inmates attack a Caucasian inmate lying in the bunk next to Hornick. One of defendant's cohorts beat the victim's head with a table squeegee and then, with the help of defendant and the other inmate, pulled the victim off his top bunk and went through his pockets, "taking what they could from him." The victim was bleeding from his head and face and was convulsing,

and his eyes rolled back in his head. About two minutes later, defendant and his cohorts pulled another Caucasian inmate from his bunk by the hair, again beating the victim and going through his pockets.

Hornick acknowledged he had suffered felony convictions for possession of stolen property, attempted robbery, burglary and sexual assault.

The prosecution introduced evidence of defendant's January 28, 1990 conviction for misdemeanor battery upon Bromley. The prosecution also introduced defendant's March 11, 1985, and April 29, 1985 convictions for felony possession for sale of cocaine and his December 3, 1986 conviction for possession of cocaine.

### 2. *Defense Case*

#### a. *Lay Testimony*

Defendant's mother, Mary Louise Cooper, testified she never married defendant's father or the father of defendant's sister. She provided for her family with government assistance and her salary as a maid. She had a difficult time caring for defendant because she had epileptic seizures and back problems. Cooper's boyfriend, Devon Williams, moved into the home when defendant was three years old, but he did not make any significant financial contribution to the household because he spent all his money on drugs.

Devon Williams died when defendant was 13 years old. Cooper then quit her job and defendant tried to help support the family. According to Cooper, on some days defendant would work instead of going to school. Cooper was aware that defendant began selling drugs at the age of 14 and that he involved himself in gangs after he returned from prison.

Cooper explained she sympathized with the parents of the victims, as defendant had once been shot and nearly died. She pleaded, however, for the jury not to sentence defendant to death.

Defendant's uncle, James Walker, testified to his role in defendant's life. He visited with defendant regularly while he was growing up and never knew him to do anything wrong. He described defendant as a nice boy. Walker never saw defendant involved in any gang activity, and was surprised to hear defendant had been convicted of murder because he was a nice and respectful boy. Walker believed defendant should be spared the death penalty because of his potential to grow and help other people.

Defendant's aunt, Dorotheria Mitchell, testified defendant was a good boy. Mitchell believed defendant was in the situation he was in because he was forced to provide for his family at such an early age. She also explained that the neighborhood where defendant was raised did not provide a good environment.

Ailine Jackson testified she had known defendant since he was 12 years old. She described him as a happy and nice child who would help his mother and neighbors with chores. Because defendant often complained of being bored at home because his immediate family engaged in very little recreation, Jackson would allow him to join her family's activities.

Jackson described defendant's chaotic family life. His stepfather Devon Williams was an unemployed drug addict who used heroin in the house. When defendant was 13 or 14, Williams would send him out late at night to buy his drugs. Defendant's mother gave her children very little supervision and it appeared to Jackson she put Williams's needs before the children's. According to Jackson, after defendant's mother stopped working, defendant quit school so he could work full time. Jackson saw a change in defendant at this time.

When defendant went to prison for selling drugs at the age of 19, Jackson testified, he became "harder" and more arrogant. He explained to her he had to join a gang in prison for protection. Jackson did not believe defendant committed the murders.

Anita Masterson, Jackson's sister, testified she had known defendant from the time he was 10 or 11 years old. Defendant often played at her house with her two sons. She described defendant as being a "good boy" who was polite and helpful. Masterson was surprised by defendant's previous incarceration because she had thought him to be such a nice boy.

Vincent Masterson, Anita Masterson's son, testified he was a childhood friend of defendant's. Defendant seemed to care less about his education as he entered high school and had to get a full-time job when he was in the ninth grade. Vincent never saw defendant use drugs, and defendant never tried to sell drugs to him. After getting out of prison, defendant appeared "harder" and "too grown up." Vincent felt defendant lacked a positive role model. He believed defendant should not be sentenced to death because he had the potential for rehabilitation.

Sylvia Stanley, who lived in defendant's neighborhood, described him as a good child who was liked by everyone. Stanley testified defendant began selling drugs at age 18 or 19, but she did not think he used them. Defendant returned from prison with tattoos and a "thuggish" demeanor.

b. *Expert Testimony*

Forensic Psychologist Adrienne Davis interviewed defendant, his family members, and his childhood neighbors, and reviewed probation, parole, and police reports pertaining to the current and previous crimes in order to evaluate his background, mental state, and personality and help explain to the jury how he came to be the person he was at the time of trial.

Dr. Davis testified that during defendant's early years, he was very dependent upon his mother and demanded much of her attention; he did not know his father. Defendant's family was very poor. Devon Williams entered defendant's life when he was four or five years old and became his father figure. During this time, social workers sometimes reported that defendant's house was in disarray and the children were dirty.

Devon Williams created inconsistency in defendant's life. On one hand, he helped defendant with his homework and encouraged him to work hard. But on the other hand, he was a drug addict who sent defendant out to buy his drugs. Defendant was upset by Williams's death and thereafter his school-work suffered.

Ailine Jackson's influence was also inconsistent. Defendant respected Jackson and she had a very strong influence on him. But she also used drugs, even in defendant's home.

Defendant became the "man of the house" at age 16 or 17. He felt obligated to care for his epileptic mother and quit school to work full time. When he lost his job, he began selling drugs. Despite having been a nonaggressive child, he was changed by Devon Williams's death and his experiences in prison. According to Dr. Davis, defendant's involvement with drugs increased the possibility of his becoming involved in violent behavior.

## II. Jury Selection Issue

Defendant, an African-American, claims the prosecutor used peremptory challenges in a racially discriminatory manner to excuse nine African-American prospective jurors. He thus argues the trial court's denial of his motion under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) violated his state and federal constitutional rights to equal protection and a representative jury. (*Batson v. Kentucky* (1986) 476 U.S. 79, 86 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*); *Wheeler, supra,* 22 Cal.3d at pp. 271–272.)

## A. *Legal Standard*

■ Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias. (*Batson, supra,* 476 U.S. at p. 89; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.)
■ In *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410] (*Johnson*), "the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 66–67 [33 Cal.Rptr.3d 1, 117 P.3d 622], quoting *Johnson, supra,* 545 U.S. at p. 168; see also *Snyder v. Louisiana* (2008) 552 U.S. ___, ___ [170 L.Ed.2d 175, 128 S.Ct. 1203].)

■ Moreover, as *Johnson* explains, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson, supra,* 545 U.S. at p. 170.) At step three, "the trial court 'must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . ." [Citation.]' " (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 [3 Cal.Rptr.3d 769, 74 P.3d 852].) A prosecutor's reasons for exercising a peremptory challenge "need not be sufficient to justify a challenge for cause." (*People v. Turner* (1994) 8 Cal.4th 137, 165 [32 Cal.Rptr.2d 762, 878 P.2d 521].) "Jurors may be excused based on 'hunches' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias." (*Ibid.*; see also *People v. Box* (2000) 23 Cal.4th 1153, 1186, fn. 6 [99 Cal.Rptr.2d 69, 5 P.3d 130].) "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso, supra,* 31 Cal.4th at p. 919.) Inquiry by the trial court is not even required. (See *id.* at p. 920.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to

evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].)

We review a trial court's ruling at step three for substantial evidence. (*People v. McDermott* (2002) 28 Cal.4th 946, 971 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

### B. *Factual Background*

The prosecutor initially used four peremptory challenges, the second through fourth of which were used against African-Americans. After the fourth challenge, defendant made a *Wheeler* motion. The trial court found a prima facie showing and asked the prosecutor to give his reasons for challenging the three African-American prospective jurors.

The prosecutor explained he excused D.H. because of her substantial exposure to gang members while growing up in Compton and her belief that a driveby shooting does not warrant the death penalty. Next, the prosecutor stated he challenged P.H. because she had been an identification witness to a crime and thus might have preconceived notions about the identification issue in this case. The prosecutor also based his excusal on the circumstance that she had a friend in state prison who committed more than one murder, but she did not believe her friend deserved the death penalty. P.H. also indicated she would not vote for the death penalty if it were on the ballot, and she previously had been disappointed with the police. Finally, the prosecutor explained that he excused D.G. because she had been unable to identify the perpetrator of a purse-snatching incident she had witnessed, her brother was a counselor with the California Youth Authority who told her stories about the wards and their troubles, and she expressed opposition to the death penalty.

The trial court denied the *Wheeler* motion, concluding the prosecutor had stated "a sufficient basis of concern as to the three jurors individually and collectively" and finding no indication of "systematic exclusion" of the jurors based on race.

The prosecutor then immediately challenged O.K., an African-American woman, and defendant renewed his *Wheeler* motion. The prosecutor explained that he was concerned O.K. would be overly sympathetic to defendant in light of her employment as a social worker working with abused children. The prosecutor also cited O.K.'s belief that the death penalty should only be applied when the defendant's guilt is "absolutely certain," suggesting she would hold the prosecution to a higher standard than the law requires. Finally, the prosecutor suspected O.K. would be sympathetic to defendant in

light of her son's multiple arrests for dealing drugs. The court concluded the prosecutor had stated "legitimate prosecutorial concerns" on an objective basis aside from that of race, and again denied defendant's motion.

After excusing two other prospective jurors, the prosecutor challenged N.B., an African-American woman, and defendant again renewed his *Wheeler* motion. The prosecutor explained he had challenged N.B. because of her opposition to the death penalty and because her husband had been convicted of manufacturing phencyclidine (PCP), which might render her overly sympathetic to persons in custody. The trial court denied defendant's motion, finding that a juror's reluctance to impose the death penalty was a proper basis for a peremptory challenge.

After excusing two more prospective jurors, the prosecutor exercised another peremptory challenge against T.S., an African-American man. Again, the defendant renewed his *Wheeler* motion. The prosecutor stated he excused T.S. primarily because he had grown up in a gang neighborhood and counted many members of the Bloods street gang among his friends. The prosecutor did not want T.S. to substitute his own knowledge of gangs in place of the expected testimony of the gang expert witness. The prosecutor also explained that he was concerned about T.S. because he had been late twice, appeared to be generally immature, and had suggested he might hold the prosecution to too strict a standard of proof. The trial court denied the motion, finding the prosecutor had articulated a nonracial basis for the peremptory challenge.

The prosecutor then excused two consecutive African-American prospective jurors and defendant renewed his *Wheeler* motion after each challenge. As to the first, T.J., an African-American man, the prosecutor explained that he appeared noncommittal and indecisive and repeatedly expressed concern that a defendant could be "set up" or evidence could be withheld, leading to the execution of an innocent person. The trial court concluded the prosecutor's reasons were race-neutral and relevant to the proceedings, holding there had been no purposeful discrimination.

As to the second, G.W., an African-American man, the prosecutor stated he had excused G.W. because of his belief that an unintentional shooting of an individual would merely constitute an accident and because he would not vote for the death penalty in an election due to his religious beliefs. The prosecutor also noted G.W. seemed strong willed and "very, very" opinionated. The trial court stated, "I am not at this point prepared to find that persons have been excluded systematically on the basis of race and, therefore, the motion is denied."

After excusing one other prospective juror and accepting the jury four times, the prosecutor exercised a peremptory challenge to exclude S.B., an African-American woman. In response to defendant's renewed *Wheeler* motion, the prosecutor explained he excused S.B. because she seemed confused, could not get past guilt phase issues in answering voir dire questions, and appeared biased against the death penalty. Finding the prosecutor had articulated "legitimate concerns" regarding S.B., the trial court denied defendant's motion.

The prosecutor excused three more prospective jurors without objection before the jury was accepted by both parties.

### C. *Analysis*

As the trial court found, and as discussed below, the record supports a finding that the prosecutor did not purposefully discriminate against any of the prospective jurors, either individually or collectively. The record also reflects that the jurors and alternate jurors selected and sworn in this case were a diverse group: Among the seated jurors, four were White, six were Black, one was Hispanic, and one described himself as "Filipino Afro"; among the alternates, three were White and one was Black. These circumstances further support the inference that the prosecutor acted in good faith and without discriminatory purpose in exercising peremptory challenges.

### 1. *D.H.*

As stated above, the prosecutor justified his challenge to D.H. on the grounds that she had substantial exposure to gang members and believed a driveby shooting does not warrant the death penalty.

During *Hovey* voir dire,[4] D.H. explained she believed in the death penalty in certain circumstances and would have to hear all the evidence to determine whether a death sentence was appropriate in this case. She also expressed her understanding of the gravity of the sentencing decision and said she would not "take it lightly." She explained, however, that in the case of a gang-related driveby shooting, she might be disinclined to vote for death because "being the age that I am, I hear it. I'm around it. And it—so it's just different reasons. I guess it could be different reasons why people could do it."

During general voir dire, D.H. said she had gone to school with gang members in Compton and South Central Los Angeles, specifically members of the In Hood, Rolling 60's, and Compton Crips. She did not, however, like to be around gang activity.

---

[4] *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] (*Hovey*).

D.H. thus had substantial exposure to gangs, resulting in her possible reluctance to impose a death sentence in a case, such as this one, involving a gang-related driveby shooting. This was a relevant, race-neutral reason for the prosecutor to exercise a peremptory challenge against her.

A comparative juror analysis does not further defendant's claim, as none of the seated jurors had similar exposure to gang activity.[5] Defendant compares D.H. with seated juror M.P., an African-American man. Preliminarily, we question whether the comparison of a prospective juror assertedly excused on account of his race with a seated juror who was a member of the same race does anything to further the *Batson/Wheeler* analysis. In any event, the comparison of D.H. with M.P. does not assist defendant. Although M.P. had some exposure to gang members and gang activity in his capacity as a plumber for the Los Angeles Unified School District, for the prosecutor to afford this experience less weight than he did D.H.'s upbringing in a gang-infested community would have been reasonable. M.P., moreover, did not share D.H.'s apparent bias against imposing the death penalty on facts similar to those in this case.

Thus, the trial court's ruling as to D.H. is supported by substantial evidence.

### 2. *P.H.*

The prosecutor asserted he challenged P.H. because she had been an identification witness to a crime, she believed a friend of hers was appropriately sentenced to life without the possibility of parole despite having committed multiple murders, she would not vote for the death penalty if it were on the ballot, and she had previously been disappointed with how the police investigated a shooting she witnessed. The trial court's denial of the *Wheeler* motion as to prospective juror P.H. is supported by substantial evidence.

During *Hovey* voir dire, P.H. explained she had a childhood friend who was serving a life sentence for murder. This friend had "committed murders on numerous occasions" and "would take a life, you know, for any reason." She did not, however, feel he deserved the death penalty because of the neighborhood he grew up in, the fact that he came from a single-parent

---

[5] Whether a court must perform a comparative juror analysis for the first time on appeal to evaluate the prosecutor's reasons for peremptorily challenging prospective jurors is an issue that is currently pending in this court in *People v. Lenix*, review granted January 24, 2007, S148029. For purposes of argument only, we assume in this case that such an analysis is required. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1106 [40 Cal.Rptr.3d 118, 129 P.3d 321].)

family, and because "this was a common way of life where he lived and where I lived." She opined these factors did not excuse her friend's behavior, but contributed to his conduct.

During general voir dire, P.H. explained that, two years earlier, she had witnessed a fatal shooting. She reported her observations to police but was never called to testify as a witness. The fact she was never called as a witness indicated to her that the police did not take the crime seriously and that it was "just no big deal to them, you know, just another life." After witnessing the shooting, she felt sorry for both the victim and the shooter. She also could "relate" to prosecution witnesses because she had been a witness to the shooting, but would not "necessarily" assume prosecution witnesses had greater credibility.

P.H.'s voir dire answers thus suggested she might be overly sympathetic to an individual with defendant's background and might have developed certain biases as a result of witnessing a fatal shooting.

Defendant argues the prosecutor's explanation for his challenge of P.H. was a pretext for racial discrimination, in that he did not challenge other jurors with similar characteristics. Seated Jurors D.G. (a Caucasian woman), and M.P., A.C., and J.L., and seated Alternate Juror F.M. (all African-American men), each had witnessed crimes in the past. Moreover, J.L. and F.M. had expressed complaints about law enforcement. In fact, F.M. had a pending lawsuit against the Los Angeles County Sheriff's Department for breaking into his residence and holding his family at gunpoint. Further, defendant claims P.H. held views on the death penalty similar to those espoused by a number of non-African-American jurors whom the prosecutor did not challenge. None of these jurors, however, had the combined characteristics of being a witness to a crime *and* expressing anti-law-enforcement sentiments. More importantly, unlike any of these seated jurors, P.H. had a friend who was imprisoned for murder but she did not believe he deserved the death penalty despite his having committed multiple murders.

The trial court's ruling as to P.H. was supported by substantial evidence.

### 3. *D.G.*

The prosecutor explained he challenged D.G. because she had witnessed a crime but was unable to identify the perpetrator; her brother was a counselor with the California Youth Authority; and she expressed anti-death-penalty sentiments. Importantly, the prosecutor indicated that "she is the one I'm really concerned about with the identity issue because this happened basically so fast that she couldn't I.D. because of surprise element [*sic*]. She may feel

that if there's a surprise element in any particular situation, that that may compromise a witness's I.D. . . ." Substantial evidence supports the trial court's conclusion the prosecutor articulated adequate race-neutral reasons for excusing D.G.

In her questionnaire, D.G. indicated that she had been a witness to a purse snatching and that her brother worked for the California Youth Authority. She also indicated she generally did not support the death penalty, she believed the death penalty was used too often, and she did not think California should have the death penalty today.

During *Hovey* voir dire, D.G. stated she was "not for the death penalty," but could impose a death sentence under the appropriate circumstances. She would vote against the death penalty if it were on the ballot.

During general voir dire, D.G. explained that about eight years before defendant's trial, she was the victim of a purse snatching. She had reported the crime to police but was unable to give an accurate description of the assailant. Her brother was a security officer for the California Youth Authority and he sometimes would tell D.G. "a sad story from an inmate's point of view."

D.G.'s questionnaire and voir dire answers suggested she would have sympathy toward defendant as a result of the stories her brother had told her about his work with the California Youth Authority, and she was unsupportive of the death penalty. Moreover, D.G. had trouble describing her assailant when she was the victim of a purse snatching, triggering the prosecutor's valid concern that she might reject the identification testimony in this case.

Again, a comparative juror analysis does little to further defendant's claim. Like D.G., seated Juror M.P. was unable to provide details about a driveby shooting he had witnessed because it happened too fast. In addition, seated Juror C.D.'s mother worked at the Federal Correctional Institution on Terminal Island and seated Alternate Juror P.H. had worked as a jailer in Nevada. None of the jurors, however, shared both characteristics relied upon by the prosecutor in excusing D.G.

The trial court's ruling as to D.G. was supported by substantial evidence.

### 4. *O.K.*

The prosecutor justified his challenge to O.K. on the basis that O.K. might be too sympathetic to defendant in light of her background in social work, her concern for abused children, and her son's history of legal problems. In

addition, the prosecutor cited O.K.'s unwillingness to impose the death penalty unless she was "absolutely certain" of the defendant's guilt.

In her questionnaire, O.K. stated she had worked for the Los Angeles County Department of Children's Services and in that capacity had made court appearances on behalf of minor children. She had an associate degree in social welfare and had taken courses in behavioral sciences, such as counseling, psychology, and sociology. She also indicated her third son had been incarcerated. This son had been arrested or charged with crimes many times and had been apprehended for selling narcotics to an undercover police officer. Finally, in her questionnaire, O.K. indicated that the purpose of the death penalty was "to apply when absolutely certain."

During *Hovey* voir dire, O.K. stated the death penalty is warranted in some cases but not others, and was too seldom used. When asked about her answer in the questionnaire that the death penalty should only be used when "absolutely certain," she explained she would not apply a standard of "no doubt whatsoever about guilt," but would apply the law as instructed by the judge.

In response to general voir dire questioning, O.K. said her son had been caught several times trying to sell drugs to undercover police officers. She believed her son was still involved in criminal activity but she did not often see him.

O.K. also explained that, in her capacity as a children's service worker for the department of children services, she helped to protect children from abuse and tried to find them compatible homes.

On this record, the prosecutor's concern about O.K.'s ability to remain objective in light of her background as a social worker was reasonable. The prosecutor noted that, based on the defense's *Hovey* voir dire, defendant apparently would be presenting evidence of abuse and neglect during his childhood, and O.K. might be overly sympathetic to him as a result. The prosecutor also reasonably might have questioned O.K.'s ability to remain objective in light of her son's criminal history. The record also provides some support for the prosecutor's concern that O.K. might hold him to too strict a burden of proof.

Moreover, a comparative juror analysis does not reveal purposeful discrimination. Like O.K., seated Jurors A.R. and A.C. had loved ones who had been incarcerated. None of those jurors, however, shared O.K.'s background in social work or expressed a tendency to hold the prosecution to too strict a burden of proof.

Because the prosecutor's reasons for excusing O.K. were race neutral and were borne out by the record, the trial court's determination was supported by substantial evidence.

### 5. *N.B.*

The prosecutor assertedly challenged N.B. because of her anti-death-penalty beliefs and because her ex-husband had been convicted of manufacturing PCP.

In her questionnaire, N.B. expressed the belief that the death penalty should only be used in "extreme" cases, with the word "extreme" underscored. She also said she believed the death penalty is used too randomly. N.B. disagreed somewhat with the propositions that someone who intentionally kills one or two people should receive the death penalty and that convicted murderers should be swiftly executed. N.B. also revealed in her questionnaire that her ex-husband had been incarcerated in 1982 for burglary and "manufacturing."

During *Hovey* voir dire, defense counsel asked N.B. how she might sentence a defendant whom she was convinced beyond a reasonable doubt had intentionally killed two people "in cold blood." She explained that under such a scenario she "would have a tendency to go with life without parole. It would have to be totally extreme for me to go with death." Upon questioning by the prosecutor, however, N.B. explained that she would be "open" to either sentence in a case where the defendant was convicted of intentionally and deliberately killing two people.

As with the other jurors, a comparative juror analysis does not reveal racial discrimination by the prosecutor. Seated Juror D.G. answered questions regarding the sentencing of a defendant who intentionally killed two people without legal justification and not in self-defense by explaining that the issue was not "cut [and] dried" and that she would have to know all of the circumstances. Seated Juror C.D. disagreed somewhat that a person who intentionally kills two people should be sentenced to death because her determination would have to be based on the facts of the case. She also strongly disagreed that convicted murderers should be swiftly executed because she did not "know any facts." Seated Juror A.G. did not believe all killers should receive the death penalty and disagreed somewhat that a defendant who intentionally kills one or two people without legal justification should be sentenced to death. A.G. also disagreed somewhat with the proposition that convicted murderers should be swiftly executed because he believed defendants should be allowed to exhaust all appeals. Also, seated Alternate Jurors F.G. and P.H. indicated in their questionnaires that they did

not fully agree with the proposition that anyone who kills one or two people without legal justification should be sentenced to death, because they believed the sentencing determination should depend on the facts of the case.

While these jurors' answers to the questionnaire contain similarities to N.B.'s answers, none of them expressed in their voir dire testimony the degree of opposition to the death penalty N.B. did. For example, N.B. explained during voir dire that she would likely vote against the death penalty if it were on the ballot and that her death penalty determination might be swayed by her religious beliefs. N.B. also wavered when asked whether she could impose the death penalty on a defendant who had been convicted of intentionally killing two people. None of the comparable jurors held so steadfastly to their anti-death-penalty beliefs under voir dire questioning.

In addition, although seated Jurors A.R. and A.C. had family members who had been incarcerated, neither of these jurors also expressed anti-death-penalty sentiments similar to those expressed by N.B.

Substantial evidence supports the trial court's conclusion that the prosecutor had bona fide, race-neutral reasons for excusing N.B.

### 6. *T.S.*

The prosecutor stated he excused T.S. because he was young, inexperienced, and had extensive exposure to gang members. The prosecutor also was concerned about T.S. because he had been late twice, appeared to be generally immature, and had suggested he might hold the prosecution to too strict a standard of proof.

In response to the questionnaire inquiry why crime rates were increasing, T.S. stated it was because "Republicans [were] in the presidency," an answer deemed immature by the prosecutor. He also explained his belief that the death penalty should be imposed when a defendant had been found guilty "without a shadow of a doubt."

During *Hovey* voir dire, T.S. was generally supportive of the death penalty, but indicated it should be imposed only if the defendant was found guilty "without a doubt."

T.S. acknowledged during general voir dire that he had had contact with members of the Bloods street gang when he lived in Compton. He admitted to being close friends with some gang members, but insisted he was not involved in gang activity and that his exposure to gangs would not bias him.

Neither the court nor the defense challenged the prosecutor's assertion that T.S. was late to the proceedings twice on the day he was excused.

This record provides support for the prosecutor's conclusion that T.S. was too immature, irresponsible, and potentially biased to serve as a juror in this case. Moreover, a comparative juror analysis is not helpful to defendant here, as none of the jurors accepted by the prosecutor exhibited characteristics similar to those that led him to excuse T.S. Notably, the prosecutor also challenged D.H. in part because of her extensive exposure to gangs.

Thus, the record provides substantial evidence to support the trial court's determination as to T.S.

### 7. *T.J.*

The prosecutor explained he challenged T.J. because he was noncommittal, expressed some anti-death-penalty views, and was overly concerned about condemning an innocent man.

During *Hovey* voir dire, T.J. expressed the opinion that the death penalty was appropriate only in certain cases, such as the killing of a child. He later indicated he strongly agreed that someone who kills an innocent person should receive the death penalty. He was unsure, however, whether he could vote for death in a case where one person was intentionally killed and another was an innocent bystander. T.J. also stated that in order to vote for the death penalty, he would have to have "no doubt" about the defendant's guilt and that the defendant should have the right to appeal to "whatever extent" necessary to ensure his guilt.[6] He explained the "no doubt" standard should be applied to the appeal process, but he would not apply that standard at trial.

T.J.'s voir dire answers revealed his uncertainty about whether he could impose the death penalty on the facts of this case. His answers were also equivocal as to what standard of proof he believed appropriate in a death penalty case. These answers gave rise to legitimate, race-neutral prosecutorial concerns.

Defendant's claim fares no better under a comparative juror analysis. Seated Juror A.G. expressed his belief that the death penalty should only be imposed when there is no doubt about the defendant's guilt, and seated Jurors J.P., M.P., and R.R., as well as seated Alternate Juror P.H., all believed

---

[6] T.J.'s juror questionnaire is not included in the record and has apparently been lost or destroyed. During *Hovey* voir dire, however, counsel questioned T.J. about his questionnaire answer that the death penalty should only be imposed when there is no doubt about the defendant's guilt. The questioning revealed that T.J. had underlined the words "no doubt."

in the importance of the appellate process for defendants sentenced to death. None of these jurors, however, exhibited the same equivocation with respect to crucial issues as did T.J.

On this record, substantial evidence supports the trial court's ruling as to T.J.

### 8. *G.W.*

The prosecutor explained he exercised a peremptory challenge against G.W. because he expressed some opposition to the death penalty, he believed that the unintentional shooting of a victim merely constituted an accident, and he appeared to be too stubborn and opinionated to appropriately participate in jury deliberations. The record supports these relevant, race-neutral concerns.

Based on his juror questionnaire and his voir dire testimony, G.W. seemed more supportive of the death penalty than many of the seated jurors. According to his questionnaire, he agreed that the intentional killing of one individual warranted the death penalty, he strongly agreed that a defendant sentenced to death should be swiftly executed, and he strongly believed in the adage "an eye for an eye." During *Hovey* voir dire, he explained he would have no problem imposing the death penalty if the crime warranted such a sentence. He also stated he would "probably" vote for the death penalty if the defendant were convicted of a premeditated murder. When questioned, however, about a crime in which one victim was the intentional target and another victim was an innocent bystander, G.W. opined the killing of the bystander would constitute an accident. He also asserted he would make his own penalty decision and would not be swayed by other jurors. Finally, G.W. asserted he could impose the death penalty because it is established law but, due in part to his religious beliefs, he would not vote for the death penalty if it were on the ballot. These views legitimately could cause the prosecutor to excuse G.W.

A comparative juror analysis also fails to provide support for defendant's claim of purposeful discrimination. Most significantly, no other juror accepted by the prosecutor shared G.W.'s belief that the unintentional killing of an innocent bystander would merely constitute an accident. This belief was understandably of concern to the prosecutor in light of the circumstance that defendant would be death eligible only if convicted of murdering both victims. G.W., moreover, was unwilling to vote for the death penalty in an election and the prosecutor had the impression G.W. was too strong willed to fairly serve as a juror.

The record therefore provides substantial support for the trial court's conclusion that the prosecutor did not engage in purposeful discrimination in excusing G.W.

### 9. S.B.

The prosecutor asserted he excused S.B. because she seemed confused, was unable to conceptualize penalty phase issues in answering voir dire questions, and appeared predisposed against the death penalty. These reasons are supported by the record.

During *Hovey* voir dire, S.B. exhibited significant confusion about the death penalty determination. First, she said the death penalty should be imposed in a case where the defendant was found guilty and a death sentence was "his last choice." When informed that the penalty imposed was not the defendant's choice, she responded: "[B]ut he have [*sic*] to be found guilty by the twelve jurors first." S.B. then acknowledged the sentence was to be determined by the jury, but insisted it did not have to recommend a sentence of death. She also stated that, in her opinion, "the death penalty is for once you find a person guilty—once you find a person guilty, the death penalty is for that reason."

When asked by the prosecutor whether a crime would have to be as heinous as those of Richard Ramirez and Charles Manson to deserve the death penalty, S.B. answered, "that or worse, yes." The prosecutor then attempted to clarify whether S.B. could recommend the death penalty for a defendant who killed fewer people than Ramirez and Manson. S.B. explained: "The case have [*sic*] to go to trial and the defendant have [*sic*] to be found guilty before I believe that they could go to the gas chamber."

S.B.'s answers reflected substantial confusion regarding the penalty phase process. In addition, they imply an unwillingness on her part to vote for death on the facts of this case. Because none of the other jurors exhibited such confusion, particularly not in addition to a potential unwillingness to impose the death penalty on the facts of this case, a comparative juror analysis does not further defendant's claim of discrimination. Thus, the record provides substantial evidence to support the trial court's determination as to S.B.

### III. Issues Relating to Guilt

### A. *Admission of Crime Scene and Autopsy Photographs*

Defendant claims the trial court erred in admitting crime scene and autopsy photographs of the victims over his objection because the photographs were

more prejudicial than probative and were cumulative of other evidence. (See Evid. Code, § 352.) In addition, defendant asserts the trial court's error in admitting the photographs violated his rights to due process, a fair jury trial and a reliable capital trial under the federal Constitution.[7]

Before trial, the prosecutor sought a ruling on the admissibility of a number of photographs, specifically People's exhibits 6A–F, 9B, and 11.[8] Exhibits 6A–F are crime scene photographs of the body of Earl Solomon: 6A shows the victim's body from the waist up; 6B depicts the victim's entire body outlined in chalk; 6C shows the victim's body from a distance, covered by a sheet; 6D is a closeup of the victim's tattooed arm; 6E focuses on blood splatters near the victim's covered body; and 6F depicts the victim's entire covered body and the blood splatters on the sidewalk. Exhibit 9B, an autopsy photograph, depicts a large exit wound in the back of Earl Solomon's head. Exhibit 11, also an autopsy photograph, shows a large bullet wound to Ava Williams's face.

The prosecutor argued the photographs were relevant to prove intent and the cause of death. He also argued that exhibits 6A–F were relevant to corroborate witness testimony, and that exhibit 6D was probative of motive. Defense counsel objected under Evidence Code section 352, arguing that intent to kill and the cause of death, as proven through exhibits 9B and 11, could be established by other, less inflammatory evidence. The trial court overruled the objection.

■ "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code,

---

[7] Defendant here and in a number of other claims urges that the error or misconduct he is asserting infringed various of his constitutional rights to due process and a fair trial. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies here: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

[8] The prosecutor initially sought to introduce exhibits 6A–G, but conceded the photograph originally identified as 6F was largely duplicative of 6E. He therefore withdrew that photograph and renumbered the exhibits 6A–F.

§ 352.) "The jury can, and must, be shielded from depictions that sensational-ize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*People v. Ramirez* (2006) 39 Cal.4th 398, 454 [46 Cal.Rptr.3d 677, 139 P.3d 64].) We review the trial court's ruling under Evidence Code section 352 for abuse of discretion (*People v. Lucas* (1995) 12 Cal.4th 415, 449 [48 Cal.Rptr.2d 525, 907 P.2d 373]), and a reviewing court will reverse a trial court's exercise of discretion to admit crime scene or autopsy photographs only when "the probative value of the photographs clearly is outweighed by their prejudicial effect." (*People v. Crittenden* (1994) 9 Cal.4th 83, 134 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

■ We have viewed the photographs contained in exhibits 6A–F, 9B, and 11 and conclude they are highly probative of motive, intent, and the cause and manner of death. Although unpleasant, they depict the nature of the crime without unnecessarily playing upon the jurors' emotions. (*People v. Ramirez, supra*, 39 Cal.4th at p. 454.) The probative value of the photographs thus is not clearly outweighed by their prejudicial effect.

■ In addition, the photographs were not made inadmissible by the prosecutor's ability to prove motive, intent, and cause of death through other evidence. (See *People v. Gurule* (2002) 28 Cal.4th 557, 624 [123 Cal.Rptr.2d 345, 51 P.3d 224] ["[P]rosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case."].) Furthermore, autopsy and crime scene photographs are not made inadmissible because they are offered to prove an issue not in dispute (*People v. Stitely* (2005) 35 Cal.4th 514, 545 [26 Cal.Rptr.3d 1, 108 P.3d 182]), and are admissible even if repetitive of other evidence, provided their probative value is not substantially outweighed by their prejudicial effect, as we have determined is true here (*People v. Cole* (2004) 33 Cal.4th 1158, 1199 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610]).

### B. *Impeachment of Joseph Widby*

Defendant next argues the trial court erred in allowing the prosecutor to impeach defense witness Joseph Widby with the fact that at the time of his testimony he was serving a 10-year federal prison sentence for a conviction of being a felon in possession of a firearm.

Before Widby took the stand, the trial court ruled that neither Widby's 1975 assault conviction nor his 1979 robbery conviction was subject to exclusion on the ground of remoteness. In addition, defendant conceded

Widby could be impeached on the basis of his more recent federal firearm conviction. Defendant moved the trial court, however, for a ruling that the fact and length of Widby's custody status was inadmissible under Evidence Code section 352. The prosecutor argued the fact that Widby was then serving a 10-year prison sentence was relevant to his credibility because it showed he did not have anything to lose by committing perjury. The trial court ruled Widby's custody status and the length of his prison term were admissible under the prosecutor's theory of relevance. On cross-examination, the prosecutor elicited from Widby that he was "basically at the beginning" of a 10-year term in federal prison.

Evidence Code section 788 provides in relevant part: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness . . . that he has been convicted of a felony . . . ." We have held that the predecessor to Evidence Code section 788 did not permit the impeachment of a witness with the length of the sentence imposed for the conviction at issue. (*People v. Smith* (1966) 63 Cal.2d 779, 790 [48 Cal.Rptr. 382, 409 P.2d 222]; see also *People v. Wynn* (1941) 44 Cal.App.2d 723 [112 P.2d 979].)

With the adoption of the so-called truth-in-evidence rule by the passage of Proposition 8 in 1982, the California Constitution was amended to read: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Cal. Const., art. I, § 28, subd. (d).)

Respondent notes that in *People v. Wheeler* (1992) 4 Cal.4th 284, 291 [14 Cal.Rptr.2d 418, 841 P.2d 938], we concluded that the truth-in-evidence rule "supersedes all California restrictions on the admission of relevant evidence except those preserved or permitted by the express words of [California Constitution, article I,] section 28[, subdivision] (d) itself." We continued: "The limitations on impeachment evidence contained in Evidence Code sections 787 and 788 do not fall within any of section 28[, subdivision] (d)'s stated exceptions to [the] general rule that relevant evidence is admissible." (*People v. Wheeler, supra,* 4 Cal.4th at p. 292.) Respondent thus argues that our holding in *Smith*—that a witness may not be impeached under Evidence Code section 788 with the length of the prison sentence—did not survive the truth-in-evidence rule. Here, the prosecutor offered information about

Widby's prison sentence to prove not the fact of the underlying conviction under Evidence Code section 788, but rather that Widby had nothing to lose by lying. (Evid. Code, § 780, subd. (f) [impeachment of witness with existence or nonexistence of bias, interest, or motive].)

We have never considered whether a witness may be impeached with the length of a prison sentence when offered not to prove the fact of the conviction, but rather to prove the witness has some other motive or bias. We need not decide that issue here, however, as any alleged error was harmless.

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 [35 Cal.Rptr.3d 644, 122 P.3d 765], citing *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Even apart from the matter of Widby's federal prison term, the prosecutor thoroughly impeached Widby's credibility. On cross-examination, Widby admitted he had suffered three prior felony convictions and was friendly with the Santana Block Crips, who had once been allied with Widby's gang, the Atlantic Drive Crips. In fact, Widby displayed for the jury Atlantic Drive Crips and Santana Block Crips tattoos on his left wrist. Also, Widby testified he had spoken to defendant while they were both incarcerated at the Los Angeles County jail, thereby supporting the prosecutor's argument that defendant solicited Widby's testimony.

Moreover, although other defense witnesses called into question the eye-witness identifications of defendant as the shooter, the jury clearly rejected their testimony by returning a guilty verdict. It is not reasonably probable the jury's categorical rejection of their testimony was based solely on the fact that Widby was serving a 10-year federal prison sentence.

Finally, the evidence against defendant was overwhelming. Multiple eye-witnesses identified defendant as the shooter and defendant's vehicle as the vehicle involved. Defendant had a motive for the killings, given the active gang war between defendant's gang and Atlantic Drive Crips, Solomon's gang. Defendant himself had been shot by an Atlantic Drive Crips member several months before he committed these offenses. In addition, defendant's behavior after the shootings reflected a consciousness of guilt: He had his car repainted and fled to Bakersfield. Also telling of defendant's state of mind was his spontaneous statement to Detective Branscomb that he did not know why he was being charged with attempted murder and that he was not in Compton on the day of the shooting, before officers had informed him of the details of the charges on which he was being held.

In light of all of the evidence, it is not reasonably probable the verdict would have been more favorable to defendant had the trial court excluded evidence of Widby's federal prison term.

### C. Guilt Phase Instructions

#### 1. CALJIC No. 8.65

Defendant contends the trial court erred by instructing the jury with CALJIC No. 8.65, which states: "When one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed." Citing *People v. Birreuta* (1984) 162 Cal.App.3d 454 [208 Cal.Rptr. 635], defendant argues that at the time of his offense in 1989, the doctrine of transferred intent could not be applied where one killed his intended victim and also accidentally killed an unintended victim. The impact of CALJIC No. 8.65 was crucial, defendant asserts, because of the prosecutor's theory at trial that defendant's intended victim was Earl Solomon and that Ava Williams was an innocent bystander. The prosecutor thus argued in summation that defendant was guilty of murdering Ava Williams under a theory of transferred intent.

Although defendant did not object to this instruction at trial, he may challenge it on appeal because it implicates his substantial rights. (§ 1259; see *People v. Gray* (2005) 37 Cal.4th 168, 235 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

In *People v. Carlson* (1974) 37 Cal.App.3d 349 [112 Cal.Rptr. 321], the defendant, who killed his pregnant wife, was convicted of voluntary manslaughter of the wife and second degree felony murder of the fetus. *Carlson* held "there can be no doubt that the doctrine of 'transferred intent' applies even though the original object of the assault is killed as well as the person whose death was the accidental or the unintended result of the intent to kill the former" and in that case, "if defendant was guilty of the killing of his wife without malice, i.e., voluntary manslaughter [citation], he would normally be guilty of the voluntary manslaughter of the fetus." (*Id.* at p. 357.) Because California law precluded a conviction of manslaughter of a fetus, the *Carlson* court reversed the murder conviction as to the fetus, finding the felony-murder rule inapplicable. (*Id.* at pp. 354–358.)

In *Birreuta,* the Court of Appeal disagreed with *Carlson,* reasoning the doctrine of transferred intent was meant to "insure the adequate punishment of those who accidentally kill innocent bystanders, while failing to kill their intended victims." (*People v. Birreuta, supra,* 162 Cal.App.3d at p. 460.)

*Birreuta* continued: "When the intended victim is killed, however, there is no need for such an artificial doctrine. The defendant's premeditation, deliberation, intent to kill and malice aforethought are all directly employable in the prosecution for murdering his intended victim. The accidental killing may thus be prosecuted as a manslaughter or second degree murder without ignoring the most culpable mental elements of the situation. There is no danger that a premeditated killing will go unpunished or be treated as a manslaughter because the murder of the intended victim will presumably be the subject of prosecution." (*Ibid.*)

██ In 2002, we disapproved *Birreuta* on this point and adopted the reasoning in *Carlson*, holding: "Whether one conceptualizes the matter by saying that the intent to kill the intended target transfers to others also killed, or by saying that intent to kill need not be directed at a specific person, the result is the same: assuming legal causation, a person maliciously intending to kill is guilty of the murder of all persons actually killed. If the intent is premeditated, the murder or murders are first degree." (*People v. Bland* (2002) 28 Cal.4th 313, 323–324 [121 Cal.Rptr.2d 546, 48 P.3d 1107].)

Defendant acknowledges *Bland,* but contends its reasoning cannot be applied retroactively to justify the transferred intent instruction here. Thus, defendant argues, under *Birreuta* he cannot be held liable for the murder of Ava Williams under a theory of transferred intent.

██ "In determining whether a decision should be given retroactive effect, the California courts undertake first a threshold inquiry, inquiring whether the decision established new standards or a new rule of law. If it does not establish a new rule or standards, but only elucidates and enforces prior law, no question of retroactivity arises. [Citations.] *Neither is there any issue of retroactivity when we resolve a conflict between lower court decisions,* or address an issue not previously presented to the courts. In all such cases the ordinary assumption of retrospective operation [citations] takes full effect." (*Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 36–37 [196 Cal.Rptr. 704, 672 P.2d 110], italics added; see also *People v. Gallego* (1990) 52 Cal.3d 115, 170 [276 Cal.Rptr. 679, 802 P.2d 169] ["for questions of retroactivity concerning matters of state law we adhere to the test employed in *Donaldson*"].)

*Birreuta* acknowledged its conflict with *Carlson* but explained that the discussion in *Carlson* was dicta, "unsupported by any real analysis." (*People v. Birreuta, supra,* 162 Cal.App.3d at p. 458.) At least one other case decided prior to defendant's offense, however, acknowledged the conflict between *Birreuta* and *Carlson.* (See *People v. Czahara* (1988) 203 Cal.App.3d 1468, 1472–1473 [250 Cal.Rptr. 836].) The conflict was acknowledged by this court

in *People v. Scott* (1996) 14 Cal.4th 544 [59 Cal.Rptr.2d 178, 927 P.2d 288]. In *Scott,* the defendant was convicted of the attempted murder of the intended victim and murder of an unintended victim based upon transferred intent. We concluded that applying the transferred intent doctrine to convict the defendant of murdering the unintended victim did not preclude also convicting the defendant of attempted murder of the intended victim. The defendant in *Scott,* citing *Birreuta,* argued such liability treated him "as if he intended to kill two people rather than one." (*Scott, supra,* 14 Cal.4th at p. 551.) *Scott* noted that "in cases involving crimes relating to both intended and unintended victims, reliance on the doctrine [of transferred intent] to assign criminal liability has led to mixed results," citing *Birreuta* and *Carlson* among other cases. (*Scott, supra,* at p. 552.) *Scott* ultimately declined to pass on the soundness of *Birreuta,* stating "the facts of the case presented here do not involve the fatal shooting of both an intended and unintended victim . . . ." (*Ibid.*)

Although we declined to pass on *Birreuta* in *Scott,* we faced the issue directly in *Bland,* and resolved the acknowledged conflict among the lower courts. While defendant attempts to dismiss *Carlson*'s reasoning as "dicta," there appears little doubt *Carlson*'s reasoning conflicted with the later decided *Birreuta,* a conflict noted in several cases, including *Scott,* and created uncertainty in the law. In fact, the first sentence in *Bland* reads: "We granted review to *resolve issues* involving transferred intent and proximate causation." (*People v. Bland, supra,* 28 Cal.4th at p. 317, italics added.) *Bland* itself did not hesitate to apply its reasoning to the defendant before that court. "Where, as here, the Supreme Court resolves a conflict between lower court decisions, there is 'no clear rule on which anyone could have justifiably relied' " to bar retroactive application. (*People v. Walsh* (1996) 49 Cal.App.4th 1096, 1106, fn. 10 [57 Cal.Rptr.2d 214].)

Thus, the trial court did not err by instructing on transferred intent in a manner consistent with *Bland.*

### 2. *CALJIC No. 2.03*

Defendant next argues that his state and federal constitutional rights to due process, an impartial and properly instructed jury, and a fair and reliable trial were violated by instructing the jury with CALJIC No. 2.03 as follows: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

Specifically, defendant argues the instruction permitted irrational inferences and was impermissibly argumentative, thereby undermining evidence supporting his mistaken identity defense.

As defendant concedes, we have rejected identical arguments in other cases. (E.g., *People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) He offers no persuasive reason to reconsider these decisions.

## IV. ISSUES RELATING TO PENALTY

### A. *Exclusion of Testimony by Criminologist*

Defendant contends the trial court's exclusion of the proffered testimony of his penalty phase investigator Joel Sickler was erroneous under state evidentiary law and violated his Eighth and Fourteenth Amendment rights to present mitigating evidence.

Defendant called Sickler, a criminologist, to testify about defendant's background and explain why people with similar backgrounds turn to gangs and crime. Sickler was also to testify that a person with defendant's background would adjust well to prison life and, if sentenced to life without the possibility of parole, would not be a management problem. Sickler began his testimony by informing the jury that he had a bachelor's degree in criminal justice and a master's degree in criminology. He explained that he had worked for seven years for the National Center on Institutions and Alternatives, advising courts on appropriate sentencing options for over 500 felony offenders. In private practice, Sickler acted as a sentencing consultant, testifying in four penalty phase hearings with respect to the defendant's background and identifying mitigating factors.

At this point, the prosecutor objected to Sickler's testimony, arguing that Sickler could not testify as to the proper sentence for defendant and that he lacked personal knowledge of defendant's background. The prosecutor contended only witnesses who actually knew defendant properly could present background evidence.

Defendant argued that Sickler would not render an opinion on the proper sentence, but rather would testify to defendant's character, background, and history as mitigating evidence under section 190.3, factor (k). Defense counsel informed the court that Sickler's testimony would be based on a variety of records, including Aid to Families with Dependent Children (AFDC) and prison records, and interviews with family members. Defense

counsel advised the court that Sickler would "synthesize" the information in the records and give a "historical" view of what happened in defendant's life.

The trial court found no authority for an expert to "synthesize" information already presented through other witnesses and no need for Sickler to testify to defendant's background in light of the other testimony presented. The court questioned whether Sickler had the expertise to testify to defendant's propensity for violence or whether he would adjust well to prison life. Nevertheless, the trial court decided to conduct a hearing under Evidence Code section 402. Accordingly, in a hearing outside the jury's presence, Sickler testified that, as a sentencing investigator, he analyzed criminal defendants' backgrounds, including personal history, character, and prior criminal record, and determined whether a defendant was suitable for probation or other alternative sentencing. His role in this case was to identify mitigating factors, which he did by interviewing defendant's friends and family members and reviewing social services, court, prison, and police records.

According to Sickler, AFDC records were relevant to show that defendant's mother, as a teenager, gave birth to defendant and his sister and that the family had been abandoned by defendant's father. He explained it would not be sufficient for the jurors simply to read the records without the help of his expert testimony because they might not be able to make the correlation between delinquency and being raised by a single mother, living in poverty, being abandoned by a father, and having a negative male role model in the home.

Sickler also reviewed police and prison reports of defendant's acts of violence while incarcerated to determine whether defendant would be a management problem if sentenced to life without the possibility of parole. Sickler acknowledged he was not qualified to offer an opinion as to how defendant would actually adjust to life in prison, and that his testimony would be limited to how a hypothetical individual with defendant's background would adjust to prison life. Sickler further acknowledged he was not a psychologist and could not testify to the psychological profile of someone with defendant's history of poverty, but rather could only testify regarding the general population.

Defense counsel argued Sickler's testimony should be admitted because, he asserted, the rules of evidence are relaxed at the penalty phase and Sickler could provide relevant testimony based on the AFDC and prison records and his interviews with witnesses. Counsel explained that it was insufficient simply to provide the jury with the records themselves because Sickler would give an overview of the mitigating evidence based on the records and interviews, which would then be "corroborated" by the lay witnesses. The

defense also argued that the prosecution opened the door to evidence of defendant's good behavior in prison by putting on evidence of defendant's violent acts while incarcerated, and suggested that Sickler could describe pertinent differences between custodial conditions in local facilities and state prison.

The trial court excluded Sickler's testimony, finding that Sickler was not an expert on any relevant issues, but ruled that the defense could present the reports reviewed by Sickler through a duly qualified expert.

■ Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (Evid. Code, § 720, subd. (a).) " 'The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement.' " (*People v. Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240].) We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion. (*People v. Smith* (2003) 30 Cal.4th 581, 627 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

The trial court did not abuse its discretion in excluding Sickler's proposed testimony. As the court reasoned, Sickler characterized himself not as an expert, but as a penalty phase investigator whose role was to collect and analyze records and information from lay witnesses about a defendant's background, and to "synthesize" such data for the jury. Although the stresses of prison life and an individual's ability to adapt to such circumstances are subjects beyond common experience and expert testimony thereon likely would have been helpful to the jury (Evid. Code, § 801, subd. (a)), Sickler was not qualified to offer such testimony. Sickler had a significant educational background in criminal justice and was experienced in noncapital sentencing alternatives, but he was not a psychologist and candidly acknowledged he was not qualified to offer an expert opinion as to the psychological impact of defendant's upbringing on his current behavior or how defendant would actually adjust to life in prison.

■ Because the trial court did not abuse its discretion in excluding Sickler's testimony, defendant's federal constitutional claim also lacks merit. A capital defendant has a constitutional right to present all relevant mitigating evidence at the penalty phase. (*Skipper v. South Carolina* (1986) 476 U.S. 1, 4

[90 L.Ed.2d 1, 106 S.Ct. 1669].) But "the United States Supreme Court never has suggested that this right precludes the state from applying ordinary rules of evidence to determine whether such evidence is admissible." (*People v. Smithey* (1999) 20 Cal.4th 936, 995 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

Even if the trial court had abused its discretion in excluding Sickler's proposed testimony, however, any error would have been harmless under both the state and federal standards. Penalty phase error is prejudicial under state law if there is a "reasonable possibility" the error affected the verdict. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961 [44 Cal.Rptr.3d 237, 135 P.3d 649].) This standard is identical in substance and effect to the federal harmless beyond a reasonable doubt standard enunciated in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*People v. Gonzalez, supra*, 38 Cal.4th at p. 961.)

Defendant intentionally fired an AK-47 into a crowded park, at one point aiming at a car containing two innocent women and their children. He shot and killed a rival gang member and an innocent teenaged mother of two. Further testimony regarding defendant's underprivileged background was largely cumulative of testimony by defendant's family members and friends that had been presented to the jury and was unlikely to overcome the heinous nature of these killings. In addition, evidence that a prisoner similar to defendant might adjust well to prison life likely would have been outweighed by the evidence of defendant's continued violence while in custody, even taking into account possible differences between local facilities and state prison. Based on these facts, there is no reasonable possibility that the penalty verdict would have been different had the jury been presented with Sickler's testimony.

### B. *Removal of Juror J.L.*

Defendant claims the trial court's decision to inquire into potential juror bias and remove, over defense objection, Juror J.L. violated state common law and defendant's state constitutional right to a unanimous jury verdict.

#### 1. *Facts*

On the second day of penalty phase deliberations, D.G., the jury's foreperson, sent a note to the court, stating, "What do we do if we have a juror that has admitted he does not believe in the death penalty, under any circumstances?" The trial court consulted with counsel and determined that "the appropriate procedure would be to have the foreperson come out and determine who the juror is and if that is the position that that person has taken, then have that juror, once identified, come out and make a determination whether or not that juror does take that stance. If so, then that juror

should be removed and an alternate selected at random and the jury instructed to begin to deliberate from the inception."

Defense counsel objected, arguing that the juror had survived extensive voir dire questioning and should not be disqualified because, in the heat of deliberations, he developed "grave reservations" about capital punishment. Defense counsel suggested that the court question D.G. about the note and admonish the entire jury that they had been qualified as capital jurors and should deliberate to the best of their ability.

The trial court declined to admonish the entire jury, viewing such a procedure as coercive. Instead the court concluded that it would inquire of D.G. and then, rather than allowing counsel to question her directly, would invite counsel to raise any lingering questions at sidebar. During the ensuing inquiry the foreperson stated that Juror J.L. had spoken with his minister the previous evening and had decided that he could not "bring himself to take another human life."

Defense counsel suggested the court inquire of J.L., and the court agreed.[9] The court then engaged in the following colloquy with J.L.:

"The Court: Is it your position that you could not vote for the death penalty under any circumstances no matter what the evidence in the case is?"

"[J.L.]: Right.

"The Court: It's without regard to what evidence is presented in the case?

"[J.L.]: Right.

"The Court: That means that you would not consider the circumstances of the crime?

"[J.L.]: Right.

"The Court: You would not consider circumstances in aggravation?

"[J.L.]: Right.

"The Court: And would you not consider circumstances in mitigation?

---

[9] The record is not entirely clear whether defendant later objected to the questioning of J.L. After Defense Counsel John Johnson requested that J.L. be called, Cocounsel John Doyle stated, "We would object as being brought out and inquired of."

"[J.L.]: Right.

"The Court: You would under no circumstances without regard to what the evidence is vote for the death penalty?

"[J.L.]: Right."

Defense counsel then requested the court ask J.L. if he would be unable to vote for the death penalty in any case, or if he was merely disinclined to impose the death penalty on the facts of this case. The trial court concluded that J.L.'s answers reflected an inability to vote for the death penalty in any case and thus declined to question him further. The court then excused J.L. and randomly selected an alternate to take his place on the jury.

### 2. Inquiry of D.G.

Defendant argues that the trial court erred by questioning D.G. regarding J.L.

"The need to protect the sanctity of jury deliberations . . . does not preclude reasonable inquiry by the court into allegations of misconduct during deliberations." (*People v. Cleveland* (2001) 25 Cal.4th 466, 476 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) In fact, a hearing is required " 'where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*Id.* at p. 478.) In making such inquiry, the trial court should focus on the juror's conduct rather than the content of the deliberations. (*Id.* at p. 485.) Ultimately, the decision whether to investigate is within the discretion of the trial court. (*People v. Burgener, supra*, 29 Cal.4th 833, 878.)

As we explained in *Cleveland*: "[P]roper grounds for removing a deliberating juror include refusal to deliberate. . . . Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*People v. Cleveland, supra*, 25 Cal.4th at p. 485.)

The foreperson's note informed the court that a juror had decided after just one afternoon of deliberations that he was unable to vote for the death penalty *under any circumstances*. Thus, the note indicated to the court that the juror was refusing to consider other points of view. Assuming the note accurately characterized the juror's attitude, the trial court was on notice that

a juror was refusing to deliberate and was subject to removal. (*People v. Cleveland, supra*, 25 Cal.4th at p. 485.) Under these circumstances, the trial court acted well within its discretion in questioning D.G., and in fact was required to do so. (*Id.* at p. 478.)

 Defendant argues, however, that rather than embarking on an investigation of D.G.'s allegations, the trial court should first have reinstructed the jury regarding their duties and allowed them to continue deliberations. We have held that such a procedure might be appropriate in many cases, but have never mandated it. In *Cleveland,* we noted that "it often is appropriate for a trial court that questions whether all of the jurors are participating in deliberations to reinstruct the jurors regarding their duty to deliberate and to permit the jury to continue deliberations before making further inquiries that could intrude upon the sanctity of deliberations." (*People v. Cleveland, supra*, 25 Cal.4th at p. 480.) But, as *Cleveland* suggests, this procedure may not be appropriate in every case. Where, as here, the trial court is faced with allegations that a juror would refuse to impose the death penalty *under any circumstances,* the court was obligated to conduct an investigation. (*Id.* at p. 478.)

### 3. Discharge of J.L.

Defendant next argues that, assuming the trial court was justified in questioning D.G., it erred in ultimately excusing J.L.

Section 1089 provides, in relevant part, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty . . . the court may order the juror to be discharged . . . ." As discussed above, a juror's refusal to deliberate constitutes proper grounds for removal. (*People v. Cleveland, supra*, 25 Cal.4th at p. 485.) The determination of good cause to excuse a juror rests within the sound discretion of the court and is upheld if supported by substantial evidence. (*Id.* at p. 474.) The juror's inability to perform, however, must " ' " 'appear in the record as a demonstrable reality.' " ' " (*Ibid.*)

The record here meets the standard enunciated in section 1089 and *Cleveland.* After a single afternoon of deliberations, J.L. consulted his minister regarding the death penalty.[10] The next day, J.L. announced to the rest of the jury that he could not vote for the death penalty under any circumstances. When questioned by the trial court, J.L. confirmed he could

---

[10] The record does not reflect the nature of J.L.'s conversation with his minister. This conversation, standing alone, might have constituted juror misconduct, but because defendant has not asserted a claim of juror misconduct in this appeal, we do not address it.

not vote for the death penalty no matter what the evidence showed. J.L. "express[ed] a fixed conclusion at the beginning of deliberations and refus[ed] to consider other points of view," thereby refusing to deliberate. (*People v. Cleveland, supra*, 25 Cal.4th at p. 485.) Thus, the trial court did not err in removing J.L. from the jury.

Defendant further argues the trial court erred in failing to clarify whether J.L. was refusing to vote for death in this case or whether he would be unable to impose a death sentence in any case. The trial court declined to question J.L. further, finding it clear from his answers that he would not impose a death sentence in any case. Its finding is supported by the record. The trial court asked whether J.L. could impose the death penalty "under any circumstances" regardless of the evidence presented in the case, and J.L. replied that under no circumstances, regardless of the evidence, would he vote for the death penalty.

The same reasoning dictates rejection of defendant's argument that the trial court's inquiry violated Evidence Code section 1150 by intruding on J.L.'s mental processes in deliberations: J.L., in effect, was not deliberating.

Thus, the trial court did not err in removing J.L. from the jury.

### C. *Penalty Phase Instructions*

#### 1. *Trial Court's Rejection of Proposed Instructions*

Defendant asserts the trial court erred in rejecting three penalty phase instructions proposed by the defense.

First, defendant claims the trial court erred in refusing his proposed instruction that "Whether or not you have a lingering doubt as to whether the defendant ·committed the two homicides of which you have convicted him, you may consider this as a factor in mitigation." We repeatedly have rejected state and federal law claims that a trial court must instruct the jury concerning lingering doubt. (E.g., *People v. Robinson* (2005) 37 Cal.4th 592, 653–654 [36 Cal.Rptr.3d 760, 124 P.3d 363].) Defendant presents no reason to revisit that conclusion.

Next, defendant argues the trial court erred by refusing to instruct the jury that "During the penalty phase of the trial testimony has been presented from the defendant's mother. She has testified to her love for the defendant and she does not wish him to be put to death. You are instructed that you may consider and take into account as mitigating factors these expressions of love and concern for Paul Watson in determining whether he should be sentenced

to death or life in prison without parole. This evidence may be sufficient standing alone to warrant the return of a verdict of life without the possibility of parole."

The trial court properly denied this instruction as argumentative. (*People v. Sanders* (1995) 11 Cal.4th 475, 559–561 [46 Cal.Rptr.2d 751, 905 P.2d 420].) This instruction merely highlighted evidence defendant wished the jury to consider in mitigation and sought sympathy for defendant's mother, an impermissible consideration. (*People v. Ochoa* (1998) 19 Cal.4th 353, 455–456 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

Finally, defendant argues the trial court erred in refusing a multipart instruction that sought to guide the jury in its weighing of aggravating and mitigating factors and its ultimate penalty determination. The proposed instruction read as follows:

"You are instructed that you may return a verdict of life without the possibility of parole, even though you should find the presence of one or more aggravating circumstances. One mitigating circumstance may be sufficient for you to return a verdict of life without the possibility of parole.

"If a mitigating circumstance or an aspect of the background, character or your observation of the defendant arouses sympathy or compassion, so as to persuade you that death is not an appropriate penalty, you may act in response thereto and opt instead for life without the possibility of parole.

"The laws of the State of California express no preference as to which punishment, death or life without the possibility of parole is appropriate. Punishment is the sole province of the jury."

The trial court properly rejected as argumentative the first part of the proposed instruction because it states that any mitigating evidence may support a sentence of life without the possibility of parole, without also stating that any aggravating evidence may support a death sentence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1135 [12 Cal.Rptr.3d 592, 88 P.3d 498].) Additionally, the point of the proposed instruction, to make clear that one factor in mitigation was sufficient in and of itself to outweigh the three factors in aggravation, was conveyed to the jury through CALJIC No. 8.88 (weight to be afforded any factor was within the discretion of the jury).

The second part of the proposed instruction was properly rejected as duplicative in light of the trial court's instruction that, in determining penalty, the jury should consider pity and sympathy for defendant. (*People v. Carter* (2003) 30 Cal.4th 1166, 1226–1227 [135 Cal.Rptr.2d 553, 70 P.3d 981].)

Finally, although it is not error for a trial court to instruct that the law has no preference as to penalty and that the penalty decision is the sole province of the jury (*People v. Samayoa* (1997) 15 Cal.4th 795, 852–853 [64 Cal.Rptr.2d 400, 938 P.2d 2]), neither was it error for the trial court to refuse to so instruct defendant's jury. The court clearly and unambiguously instructed the jury that the decision between a sentence of death and life without the possibility of parole was within their exclusive discretion. Specifically, the trial court instructed the jury that it "must now determine which of said penalties shall be imposed on the defendant" (CALJIC No. 8.84), that it was to determine which penalty was to be imposed based on all the evidence received during any part of the trial (CALJIC No. 8.85), that nothing the court did or said should be taken as to "intimate or suggest what you should find to be the facts" (CALJIC No. 17.30), and that "[e]ach of you must decide the case for yourself . . ." (CALJIC No. 17.40). Perhaps most significantly, the jury was instructed pursuant to CALJIC No. 8.88 as follows:

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without the possibility of parole, shall be imposed on the defendant.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] . . . [¶]

"You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

In light of these instructions, there was no room for the jury to speculate that the laws of the State of California had a preference as to penalty. Rather, the jurors certainly must have understood that the decision was left to their sole discretion.

### 2. *Definition of Life Without the Possibility of Parole*

Defendant claims the trial court had a sua sponte duty to instruct the jury that a sentence of life without possibility of parole meant that defendant

would never be considered for parole. We addressed this argument in *People v. Holt* (1997) 15 Cal.4th 619, 687–689 [63 Cal.Rptr.2d 782, 937 P.2d 213], holding that a trial court does not have a sua sponte duty to define "life without the possibility of parole" because the term has a plain meaning that does not require further explanation. We further concluded such an instruction would be erroneous given the gubernatorial powers of pardon and commutation and the possibility that the death penalty statute could be invalidated in the future. (*Id.* at p. 688.) Defendant presents no reason to reconsider our holding.

### 3. *CALJIC No. 8.85*

Defendant next argues that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution were violated when the trial court instructed the jury with CALJIC No. 8.85.[11]

---

[11] CALJIC No. 8.85 (5th ed. 1988) parallels the provisions of section 190.3, instructing: "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true.

"(b) The presence or absence of criminal activity by the defendant, other than the crime for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle."

Although defendant did not challenge this instruction at trial, this claim is cognizable on appeal because it implicates his substantial rights. (§ 1259; see *People v. Gray, supra,* 37 Cal.4th 168, 235.)

Defendant first argues that section 190.3, factor (b) (factor (b)) violates his rights to due process and equal protection by failing to provide sufficient guidance to the jury regarding their consideration of defendant's past unadjudicated criminal conduct. We previously have rejected this argument. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1138 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

Next, defendant argues that factor (b) violated his rights to due process and a reliable penalty determination under the Eighth and Fourteenth Amendments by permitting the jury to consider unreliable evidence of his unadjudicated criminal conduct. Thus, he appears to mount a broad attack on the consideration by the jury of unadjudicated criminal conduct generally. We often have rejected this contention. (E.g., *People v. Anderson* (2001) 25 Cal.4th 543, 584 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

■ Defendant also claims that factor (b) violates state and federal constitutional rights to equal protection and due process because it allows the consideration of unadjudicated criminal conduct in capital sentencing, while such conduct may not be used in sentencing noncapital offenders. His claim fails because "capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law . . . ." (*People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614], citations omitted.)

Finally, defendant argues the trial court violated his constitutional rights by failing to delete inapplicable factors from CALJIC No. 8.85. We previously have rejected this argument. (*People v. Perry* (2006) 38 Cal.4th 302, 319 [42 Cal.Rptr.3d 30, 132 P.3d 235].) Defendant presents no persuasive reason to reconsider our precedents.

### 4. *Scope of Sentencing Discretion*

Defendant asserts that CALJIC No. 8.88 violated his rights to due process, a fair jury trial, and a reliable penalty determination.[12] This claim is cognizable on appeal despite defendant's failure to object at trial because it implicates his substantial rights. (§ 1259; see *People v. Gray, supra*, 37 Cal.4th at p. 235.)

■■■ Contrary to defendant's arguments, his constitutional rights were not infringed by the reading of CALJIC No. 8.88. First, the language in CALJIC No. 8.88 directing the jury to determine whether the aggravating circumstances are "so substantial" in comparison to the mitigating circumstances is not unconstitutionally vague. (*People v. Chatman* (2006) 38 Cal.4th 344, 409 [42 Cal.Rptr.3d 621, 133 P.3d 534].) Moreover, CALJIC No. 8.88 is not defective in requiring the jury to determine whether the death penalty is "warranted" rather than "appropriate." (*People v. Perry, supra*, 38 Cal.4th at p. 320; *People v. Medina* (1995) 11 Cal.4th 694, 781 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Neither is it defective in failing to inform the jurors that defendant did not carry the burden of persuading them that the death penalty was inappropriate. (*People v. Medina, supra*, 11 Cal.4th at p. 782.) Finally, the trial court need not instruct the jury that a life sentence is mandatory if circumstances in aggravation do not outweigh those in mitigation, or that a life sentence could be imposed even if aggravating evidence outweighed mitigating evidence. (*Id.* at pp. 781–782.)

---

[12] As modified at trial, CALJIC No. 8.88 (5th ed. 1988), reads as follows:

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant.

"After having heard all of the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors or aggravating and mitigating circumstances upon which you have been instructed.

"An aggravating factor is any fact, c[ondition] or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself.

"A mitigating circumstance is any fact, condition or event which, as such, does not constitute a justification or excuse for the crime in question but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.

"In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.

"To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

### D. *Constitutionality of California's Death Penalty Law*

Defendant presents a number of familiar attacks on the constitutionality of California's death penalty statute. We previously have rejected these arguments, and defendant presents no compelling reason for us to reconsider those holdings. Below we briefly describe defendant's arguments and the cases rejecting them.

California's death penalty law is not unconstitutional for failing to sufficiently narrow the class of death-eligible defendants to the most serious offenders. (*People v. Perry, supra,* 38 Cal.4th at p. 322; *People v. Demetrulias* (2006) 39 Cal.4th 1, 43–44 [45 Cal.Rptr.3d 407, 137 P.3d 229].)

Allowing the jury to consider the circumstances of the crime under section 190.3, factor (a) does not lead to the arbitrary and capricious imposition of the death penalty. (*People v. Guerra, supra,* 37 Cal.4th 1067, 1165; *People v. Hinton* (2006) 37 Cal.4th 839, 913 [38 Cal.Rptr.3d 149, 126 P.3d 981]; *People v. Kennedy* (2005) 36 Cal.4th 595, 641 [31 Cal.Rptr.3d 160, 115 P.3d 472].)

The death penalty statute is not unconstitutional for failing to impose a proof-beyond-a-reasonable-doubt standard for finding the existence of aggravating factors, finding aggravating factors outweigh mitigating factors, or finding that death is the appropriate penalty. (*People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Box, supra,* 23 Cal.4th 1153, 1216.)

California's death penalty law is not unconstitutional for failing to impose a burden to prove that death is appropriate, either beyond a reasonable doubt or by a preponderance of the evidence. (*People v. Perry, supra,* 38 Cal.4th at p. 321; *People v. Box, supra,* 23 Cal.4th at p. 1216.) Neither is the law invalid for not requiring a jury instruction on the burden of proof. (*People v. Box, supra,* 23 Cal.4th at p. 1216; see also *People v. Morrison* (2004) 34 Cal.4th 698, 731 [21 Cal.Rptr.3d 682, 101 P.3d 568] [neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] warrants reconsideration of our conclusion that the death penalty statute is not unconstitutional for failing to provide the jury with instructions on the burden of proof].)

A jury in a capital case need not make written findings or achieve unanimity as to aggravating circumstances. (*People v. Kennedy, supra,* 36 Cal.4th at p. 641; *People v. Morrison, supra,* 34 Cal.4th at p. 730.) California's death penalty statute does not violate equal protection by denying capital defendants certain procedural safeguards, such as jury unanimity and written

jury findings, while affording such safeguards to noncapital defendants. (*People v. Blair* (2005) 36 Cal.4th 686, 754 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)

The jury properly may consider a defendant's unadjudicated criminal activity at the penalty phase and need not agree unanimously that the defendant committed those acts. (*People v. Smith, supra,* 30 Cal.4th 581, 642; *People v. Michaels* (2002) 28 Cal.4th 486, 541–542 [122 Cal.Rptr.2d 285, 49 P.3d 1032].)

The use of restrictive adjectives, such as "extreme" and "substantial," in the sentencing statute and instructions do not render either unconstitutional. (*People v. Kennedy, supra,* 36 Cal.4th at p. 641.)

California's death penalty statute is not unconstitutional for failing to require a jury instruction as to which factors are aggravating and which are mitigating, or an instruction that the absence of mitigating factors does not constitute aggravation. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1041 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

Finally, the federal Constitution does not require intercase proportionality review. (*People v. Kennedy, supra,* 36 Cal.4th at p. 641.)

### E. *Violation of International Law*

Defendant contends that the use of capital punishment as an assertedly "regular" form of punishment for substantial numbers of crimes, rather than as an extraordinary punishment for extraordinary crimes, violates international norms of human decency. He also argues that the use of the death penalty as a "regular" form of punishment violates the law of nations and is therefore unconstitutional "because international law is part of our law." We have rejected both of these arguments (see, e.g., *People v. Blair, supra,* 36 Cal.4th 686, 754–755), and defendant presents no reason to reconsider our conclusion.

### V. CUMULATIVE ERROR

Defendant argues that the cumulative effect of errors in both phases of his trial undermined the fundamental fairness of his trial and the reliability of his sentence. Whether considered independently or together, any errors or assumed errors are nonprejudicial and do not undermine defendant's conviction or sentence.

## VI. Disposition

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied June 18, 2008. George, C. J., Werdegar, J., and Corrigan, J., did not participate therein.