Filed 4/22/13  P. v. Leon CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DOUGLAS LEON,<br><br>    Defendant and Appellant. | B232418<br><br>(Los Angeles County<br>Super. Ct. No. BA366993) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Judith L. Champagne, Judge.  Affirmed.

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Douglas Leon appeals from his conviction of first degree murder and attempted extortion.[1]  He contends the trial court erred in (1) denying his *Batson-Wheeler*[2] motion; (2) excluding evidence that would have impeached the prosecution's gang expert; (3) allowing the prosecutor to pose an improper hypothetical; and (4) imposing large fines without submitting the underlying factual issues to the jury. He also contends there was insufficient evidence to support the finding of premeditation. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established that on January 15, 2010, defendant was a member of the criminal street gang known as the Maywood Locos, which claimed the 5500 block of Gifford Avenue in the City of Maywood as their territory and considered the Orchard Locos to be their rivals.  At about 9:30 that Friday night, 16-year-old Bryan and two friends, 17-year-old Angel and 15-year-old Tiffany, were waiting to get into a party at that location when defendant fatally shot Bryan five times.  Fifteen-year-old Andy M. was shot in the leg as he was running from the scene.

---

[1]     Defendant was charged by amended information with the first degree murder of Bryan Barraza; the attempted premeditated murders of Andy M., Angel S. and Tiffany B., and the attempted extortion of Kevin E.  Gang and firearm enhancements were also alleged.  A jury found defendant guilty of first degree murder and attempted extortion; it found true a gang enhancement on each count (Pen. Code, § 186.22, subd. (b)); as to the murder, it found true three firearm enhancements (§ 12022.53, subds. (b), (c), (d) & (e)(1)); and as to the extortion it found true one firearm enhancement (§ 12022.5, subd. (a).)  Defendant was sentenced to 50 years to life in prison comprised of 25 years to life for the murder, plus a consecutive 25 years pursuant to section 12022.53, subdivision (d) [principal personally and intentionally discharged a firearm causing death]; plus a concurrent 10 years for the extortion (the two-year midterm, plus five years for the gang enhancement, plus three years for the gun use). Defendant timely appealed.

[2]     *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

*A.* *Eyewitness Testimony*

Bryan's childhood friend, Angel, testified that he and his girlfriend, Tiffany, walked with Bryan to the party that night.[3] Defendant and four companions came out of the party and approached the threesome as they were waiting to get in. Defendant asked Angel and Bryan, "Where you from?" Angel replied, "I don't bang. I ain't from nowhere." Bryan, who was standing to Angel's left, did not respond. As he turned to speak to Tiffany on his right, Angel kept an eye on Bryan and defendant, because he was concerned. Angel saw defendant move behind Bryan's left shoulder, pull a gun out of his waistband with his right hand and fire five shots toward Bryan and Angel. Bryan jerked back and when Angel turned he saw Bryan on the ground and defendant running north still holding the gun.

Angel and Tiffany ran south, to a house on the corner of Gifford Avenue and 56th Street, where Angel saw another young man who had been shot in the leg enter. From there, Angel called 911 and reported that a gang member had just shot his best friend. While waiting outside for the police to arrive, Angel saw a car pull up in front of the house; defendant, still holding a gun, got out of the front passenger seat and another person got out of the backseat of that car; Angel made eye contact with defendant. At the sound of the approaching police cars, defendant and his companion got back into the car, which drove away. Defendant was wearing a black Dodger's jacket over a black T-shirt; he had a gang tattoo on his forehead but Angel could not recall what it said. From a photographic lineup, Angel identified defendant as the shooter.

The account of the incident Tiffany gave to officers at the scene was the same as Angel's in all material respects. She recalled that after Angel and Bryan said they were not in a gang, the man who had approached them walked past, then turned and fired five shots in their direction. Tiffany described the shooter as an 18- to 20-year-old, 130 to 150 pounds, 5'8" male Hispanic with acne, a shaved head and the words "Maywood

---

**3**      Because Angel was killed in a car accident before trial, his preliminary hearing testimony was read to the jury.

Loco" tattooed on his forehead; he was wearing a black Dodger's jacket, white T-shirt and pants of an unknown color.

Later that same night, Sergeant Frank Garcia tape recorded two interviews with Tiffany. From a photographic lineup, she identified defendant as the shooter. She recalled that defendant pulled out a silver gun and shot Bryan. Tiffany did not remember seeing anyone being pushed and did not think Bryan said anything to upset defendant. She also saw the brown car, in which she believed defendant was riding, pull up in front of the second house.

Contrary to what she said in her tape-recorded interview, Tiffany testified at trial that she never saw a gun but believed the shooter, who she did not identify, was a person with a tattoo because that person was standing in front of his three companions. Tiffany did not want to testify against defendant because she was afraid of repercussions from his gang.

Sixteen-year-old Kevin told the police officer who interviewed him at the scene that he was one of three D.J.'s at the party that night. Kevin was familiar with the Maywood Locos from living in the neighborhood and knew that defendant was a Maywood Loco. Kevin had seen defendant with a chrome automatic pistol in his waistband at several parties in the past and on the night in question.

In a tape-recorded interview that same night, Kevin told Homicide Detectives Ralph Hernandez and Kevin Lowe that he saw defendant shoot Bryan. Kevin recounted that sometime before the shooting, defendant asked Kevin, "What's up, man? You bang?" Kevin recognized the gun defendant was holding at the time as the same gun he had seen defendant holding at prior parties. Kevin responded that he was "not from no where. I said, I don't mess with Maywood Locos." Defendant then announced that he was going to be "charging," which Kevin understood to mean collecting admission from people entering the party.[4] A little while later, Kevin saw defendant approach Bryan,

---

**4**    A gang expert testified that "taxing" is one way gang members make money. If someone does not pay up, or is perceived by the gang member to be disrespectful, the gang member might kill the person.

4

Angel and Tiffany. He heard defendant ask them, "You bang?" In response, Bryan tried to "act all hard" and pushed defendant; defendant responded by shooting Bryan in the leg and then the head. Kevin heard as many as 10 gunshots. From a photographic lineup, Kevin identified defendant as the shooter.

At trial, Kevin denied seeing the shooting, seeing defendant holding a handgun that night or at any other time, and that he had identified defendant as the shooter.

Andy, who was shot in the leg in the incident, identified defendant as the shooter from a photographic lineup shown to him by police at the hospital the next day. During his interview with police, he stated Bryan claimed to be from the Orchard Locos gang.

At trial, Andy maintained that he never saw the shooter but heard an argument involving two males followed by silence and then six gun shots. Andy did not recall talking to detectives at the hospital the next day or identifying defendant as the shooter from a photographic lineup.

## B.     *Gang Expert Testimony*

Former Maywood police officer and current Deputy Sheriff Andrew Serrata testified as the prosecution's gang expert. Serrata explained that when a gang member asks someone, "Where are you from?" it is a challenge. The gang member is trying to ascertain whether the other person is in a rival gang. The answer, even if the person denies gang membership, is often followed by violence. "Snitches" are threatened, assaulted and sometimes killed by gang members. It is not uncommon for witnesses in gang-related cases to be reluctant to testify for fear of retaliation.

Deputy Serrata was familiar with the Maywood Locos from being in school with members of that gang as well as from his work as a police officer. In 2005, Serrata was assigned to monitor the Maywood Locos. Since then, he has investigated about 200 crimes involving that gang. The Maywood Locos and the Orchard gang are rivals. Serrata had known defendant for two or three years and knew him to be a member of the Maywood Locos.

The primary activities of the Maywood Locos are narcotics sales, assault, robbery, burglary, assault with a deadly weapon, attempted murder and murder. Deputy Serrata explained that Maywood Locos have to earn their tattoos: a new member is allowed to get a small tattoo, usually the letter "M"; the more work that person puts in on behalf of the gang, the more and larger tattoos they can get; the "Maywood" tattoo on defendant's forehead indicates that he is a shot caller.

Based on a hypothetical posed by the prosecutor that mirrored the facts of the case, Deputy Serrata stated his opinion that the murder and attempted murders were committed for the benefit of, at the direction of or in association with a Maywood Locos gang member.

Defense counsel posed his own hypothetical: if an Orchard Street gang member enters into Maywood Locos territory, is asked by a Maywood Locos gang member where he is from, responds by identifying himself as a member of Orchard Street and pushing the Maywood Locos gang member, "Do you, hypothetically speaking, anticipate some altercation occurring as a result of that contact?" Deputy Serrata responded affirmatively. Even if a person responded that he is "from no where," Serrata would be afraid of a shooting. In Serrata's opinion, if a gang member confronted three people, only one of whom was a rival gang member, and the gang member shot towards those three people, the gang member would have intended to shoot all three because he would perceive them to be threatening as a group.

## DISCUSSION

A. *Denial of Defendant's* Batson-Wheeler *Motion Was Not Error*

Defendant contends the prosecutor used peremptory challenges to exclude Hispanic jurors in violation of *Batson*, *supra*, 476 U.S. 79 and *Wheeler*, *supra*, 22 Cal.3d 258. He argues that (1) defense counsel made a prima facie case that Juror Nos. 1 (7317), 3 (1530), 4 (6504), and 7 (0151) were excused because of group bias and (2) the

6

nondiscriminatory justifications articulated by the prosecutor were sham excuses. We are not persuaded.

A prosecutor's use of peremptory challenges to strike prospective jurors because of group bias (i.e., bias based on the juror's membership in a racial, religious, ethnic or similar group) violates a criminal defendant's right to trial by a jury drawn from a representative cross-section of the community under both the Fourteenth Amendment to the United States Constitution and article I, section 16 of the California Constitution. (*People v. Bell* (2007) 40 Cal.4th 582, 596 (*Bell*).) Ruling on a *Batson-Wheeler* motion requires a three-part inquiry. First, the defendant must make out a prima facie case by showing that the totality of the circumstances gives rise to an inference of discriminatory purpose. Second, if the defendant does so, the burden shifts to the prosecution to adequately explain its peremptory challenges by offering group bias-neutral justifications for the strikes. Third, if such an explanation has been given, the trial court must decide whether the defendant has proven purposeful discrimination. (*Bell,* at p. 596.) As we shall explain, the trial court did not err in finding defendant did not make a prima facie showing of group bias. Even assuming defendant had done so, he has not shown that the prosecutor's articulated reasons for excusing the jurors in question were not bona fide.

1.  Factual Background

The challenged jurors testified as follows:

• Juror No. 7317 lived in East Los Angeles, was married and had three small children. His only experience with litigation was a workers' compensation case which he believed was handled appropriately. He knew no one working in law enforcement or the legal system and had never met a policeman. He had experience with rifles. His family had not been affected by street gangs, but he had observed the effects of gang activity in his community. He believed that gang members could tell the truth. Asked if he could do the job of being a juror, he responded: "I am nervous about it. I never done it before." Juror No. 7317's opinion would not be affected if someone said the victim was a gang member.

7

• Juror No. 1530 lived in northeast Los Angeles, had a partner and a one-year-old daughter. She had no prior jury experience, had never been a victim of, or witness to, a crime. Her brother was awaiting trial on drug possession charges, and she had been with him at every court appearance. Although she believed that the evidence against her brother had been planted in his car, she did not have a negative impression of law enforcement. Currently a student, Juror No. 1530 wanted to be a social worker and to work with children. She had heard of street gangs but was not familiar with them. Recently, a school friend and his brother who were not gang members were shot and killed outside their home by gang members. Despite this experience, she could remain objective in this case.

• Juror No. 6504 lived in the San Gabriel Valley, was not married and had never served on a jury. Asked whether he could think of any way in which street gangs had impacted his life, he stated, "No. Not really. There has been instances but nothing serious." Asked to elaborate, he said that when he was younger there was a driveby shooting "a couple doors down" from his house.

• Juror No. 0151 lived in Santa Monica, was married and had two adult children. He had been an alternate juror in a criminal trial in which the defendant was acquitted of possession of rock cocaine. Juror No. 0151 worked as a cook at a hospital; he did not have any opinion as to whether he was a good cook. He knew that gangs existed but did not know anyone whose life had been affected by a gang. Asked whether he could listen to the testimony even if the victim was a gang member, Juror No. 0151 stated, "No. I don't know anybody involved in this case. I have no judgment or opinions."

The prosecutor exercised peremptory challenges to eight prospective jurors including Nos. 7317, 1530 and 6504, without objection. After she exercised her ninth peremptory to excuse Juror No. 0151, defense counsel made a *Batson-Wheeler* motion, arguing that the prosecutor was excusing all Hispanics. The trial court noted that there was still a diverse prospective jury panel, then stated: "I'm not making a finding at this stage. But if you have any justification for your choices that you want to mention to

8

refresh the court's recollection, it would be helpful." The prosecutor responded that she excused Juror No. 7317 because, although he said he saw the effect of gangs in his community, he appeared accepting of them. She excused Juror No. 1530 because she appeared to have a problem with the police and her claim to have been unaffected by the recent gang-related murder of two friends was not credible. She excused Juror No. 6504 because she did not credit his claim that he could be objective despite a driveby shooting that occurred down the street from his home. Finally, she excused Juror No. 0151 because he seemed too indecisive. This colloquy followed:

"THE COURT: All right. I appreciate your refreshing the court's recollection. And I don't see any pattern of abuse of the peremptory challenges here. Specifically related to Hispanics. [¶] Do you want me to go through all the Asians as well or are you satisfied? [¶] [DEFENSE COUNSEL]: I'm satisfied. [¶] . . . [¶] THE COURT: Really, counsel, if I were to grant a Wheeler motion, do you think we'd be any farther ahead in getting a fair jury? [¶] [DEFENSE COUNSEL]: No. I submit it. For example, I just don't recall, and I know it's late in the day, but I don't recall anybody admitting being involved in gang activity. [¶] THE COURT: We've had a couple people that have talked about one of their friends dating someone, having friends who have been falsely accused and convicted. [¶] [DEFENSE COUNSEL]: That's true. [¶] THE COURT: So those are valid reasons. Okay. Thank you. I don't find a prima facie case. [¶] [DEFENSE COUNSEL]: Okay. That's fine. [¶] [THE PROSECUTOR]: Thank you. Done."

### 2. Defendant Did Not Establish a Prima Facie Case of Group Bias

"To make a prima facie showing of group bias, 'the defendant must show that under the totality of the circumstances it is reasonable to infer discriminatory intent.' [Citations.]" (*People v. Davis* (2009) 46 Cal.4th 539, 582; see also *Johnson v. California* (2005) 545 U.S. 162 [prima facie case requires no more than evidence or circumstances that give rise to an inference of discrimination].) A single instance of discrimination is constitutionally proscribed. (*People v. Howard* (2008) 42 Cal.4th 1000, 1016.) Some

9

examples of the types of evidence that are relevant to establishing a prima facie case include that the prosecutor struck most or all of the members of the identified group from the venire; used a disproportionate number of his or her peremptories against that group; the only characteristic shared by the jurors in question is their membership in the group; and the failure of the prosecutor to engage questioned jurors in "more than desultory voir dire." (*Davis,* at p. 583.) In determining whether the trial court erred in finding that no prima facie showing of group bias had been made, we examine the totality of all the relevant circumstances, including the entire record of voir dire of the challenged jurors. (See *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1108.) When, as here, "the trial court expressly states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for the record on appeal, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied. [Citations.] Under such circumstances, we sustain the trial court if, upon independently reviewing the record, we conclude the totality of the relevant facts does not give rise to an inference of discriminatory purpose." (*Howard*, *supra*, at p. 1018; see also 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Criminal Trials, § 596 [appellate court will affirm trial court's finding of no prima facie case if the record suggests grounds on which the prosecution might reasonably have challenged the jurors in question].)

Based on our independent review of the record, we agree with the trial court that the defendant did not make a prima facie case that the prosecutor challenged the jurors in question because they were Hispanic. This is because the record suggests race-neutral reasons for the challenges. For example, Juror No. 1530's testimony that her brother was awaiting trial on drug possession charges and she believed the police had planted evidence against him was a race-neutral reason for excusing that juror. (See *People v. Roldan* (2005) 35 Cal.4th 646, 703 [prospective juror's negative experience with criminal justice system is a race-neutral ground for a peremptory challenge]; *People v. Farnam* (2002) 28 Cal.4th 107, 138 [close relative's adversarial contact with criminal justice system is race neutral]; see also *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1386

[skepticism about the criminal justice system is race neutral].) In addition, Juror No. 1530 was studying to be a social worker, another race-neutral reason for excluding her. (See *People v. Watson* (2008) 43 Cal.4th 652, 677 (*Watson*) [juror's background in social work was race-neutral reason for exclusion]; *People v. Trevino* (1997) 55 Cal.App.4th 396, 411 [providers of social services]; *People v. Perez* (1996) 48 Cal.App.4th 1310, 1315 [those working in social services field].)

Although they downplayed its impact on their lives, the experiences with gangs in their respective communities described by Juror Nos. 7317 and 6504 was a race-neutral reason for excluding each of them. (See *Watson, supra*, 43 Cal.4th at p. 679 [neighborhood exposure to gangs may bias a prospective juror despite the juror's insistence that it would not].)

Juror No. 0151 had been an alternate juror in a criminal trial in which the defendant was acquitted. Prior jury service is a race-neutral reason for exercising a peremptory challenge. (See *People v. Lewis* (2006) 39 Cal.4th 970, 1014; *People v. Reynoso* (2003) 31 Cal.4th 903, 918.)

       3.      <u>Substantial Evidence Supports a Finding That the Prosecutor Relied on Race-Neutral Reasons for Excusing the Questioned Jurors</u>

Even assuming for the sake of argument that defendant established a prima facie case of group bias – which we do not believe he did – defendant failed to show that the prosecutor's stated reasons for excusing the jurors in question were not credible. We review the trial court's ruling on a *Batson-Wheeler* motion for substantial evidence. In so doing, we presume that the prosecutor used peremptory challenges in a constitutional manner and defer to the court's ability to distinguish bona fide reasons from sham excuses. " 'As long as the court makes "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered its conclusions are entitled to deference on appeal." ' [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1104, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

11

Here, the trial court appears to have made a sincere and reasoned effort to evaluate the prosecutor's nondiscriminatory justifications and its finding that defendant did not make a prima facie case of group bias is supported by the evidence. The prosecutor's race-neutral reasons for excusing the challenged jurors were reasonable inferences from the jurors' statements. For example, from Juror No. 7317's statement that gangs had no effect on his immediate family even though he saw the effect of gangs in his community, it was reasonable to infer that he was too accepting of gangs to make a good prosecution juror; from Juror No. 1530's statement that she believed the evidence against her brother had been "planted," it was reasonable to infer that she may have a problem with police; from Juror No. 6504's characterization of a driveby shooting as "nothing serious," it was reasonable to infer that he, like Juror No. 7317, was too accepting of gang violence to make a good prosecution juror; from Juror No. 0151's participation in a criminal case that resulted in acquittal, as well as his refusal to state whether he thought he was a good cook, it was reasonable to infer that he was not decisive enough to be an effective juror.

## B.    *Denial of Defendant's* Pitchess *Motion Was Not an Abuse of Discretion*

Defendant contends the trial court abused its discretion by denying his *Pitchess* motion.[5]  He argues that the motion sought evidence of officer misconduct amounting to moral turpitude by gang expert Deputy Serrata, which was relevant to impeach Serrata. We find no error.

The sole and exclusive means by which citizen complaints against police officers may be obtained are the *Pitchess* procedures codified in Penal Code sections 832.7 and 832.8, and Evidence Code sections 1043 and 1045.  (*Brown v. Valverde* (2010) 183 Cal.App.4th 1531, 1539.)  A *Pitchess* motion must include, among other things, an affidavit showing good cause for the discovery sought.  (Evid. Code, § 1043, subd. (b)(3); *Brown*, at p. 1539; see also *Galindo v. Superior Court* (2010) 50 Cal.4th 1, 12.)  "To show good cause as required by [Evidence Code] section 1043, [the]

---

[5]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges" and "articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1024 (*Warrick*).) The declaration "must also describe a factual scenario supporting the claimed officer misconduct." (*Ibid.*) The threshold showing of good cause required to obtain *Pitchess* discovery is "relatively low." (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83, 94.) We review *Pitchess* orders under the abuse of discretion standard. (*People v. Hughes* (2002) 27 Cal.4th 287, 330.)

Here, defendant sought all complaints against Serrata "for officer misconduct amounting to moral turpitude, including allegations of excessive force, dishonesty, false arrest, fabrication of police reports" and related misdeeds. Counsel's declaration in support of the motion stated: "Based upon information and belief, I am informed that officer Serrata is under investigation for the use of excessive force during an arrest in or about August 2010. Based upon information and belief, officer[] Serrata shot the arrestee approximately six times after the arrestee was already subdued and apprehended. Because officer Serrata is a critical witness in the matter . . . it is imperative that the *Pitchess* motion be granted in order to ascertain information with respect to Serrata's use of excessive force, and/or the submission of false testimony, or false police reports. [¶] In addition, the materials obtained would be used by the defense to locate witnesses to testify as to Mr. Serrata's character traits, habits, and customs for engaging in acts untruths and, or falsifying police reports and planting evidence. These character traits of the officer are relevant to show the officer's propensity to engage in untruthfulness, and that the officer has engaged in such conduct in this case."

Counsel's declaration does not propose a defense or defenses to the pending charges or articulate how the discovery sought may lead to relevant evidence that would support any proposed defenses. (*Warrick, supra*, 35 Cal.4th at p. 1024.) Deputy Serrata was not involved in the investigation of the charged crimes and defendant did not suggest how alleged prior misconduct by Serrata relates to any proposed defense. Given the

13

tenuous connection between unsubstantiated and speculative notions of excessive force and the officer's expert testimony, denial of the *Pitchess* motion was not an abuse of discretion.

C.      *The Prosecutor's Hypothetical Was Not Improper*

Defendant contends he was denied due process by an improper hypothetical posed to the gang expert by the prosecutor. He argues that the question, to which he objected, amounted to argument. We find no error.

In *People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*), our Supreme Court recently explained that use of hypothetical questions must be " 'rooted in facts shown by the evidence.' [Citations.]" The question need not encompass all of the evidence and may assume facts " ' "within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question." [Citation.]' " (*Id*. at p. 1046.) A hypothetical that precisely mirrors the actual facts of the case is proper. (*Id*. at p. 1048.) We review for abuse of discretion the trial court's ruling allowing expert testimony. (*People v. Mendoza* (2000) 24 Cal.4th 130, 177.)

Here, using a hypothetical that accurately reflected the facts of the case, the prosecutor asked Deputy Serrata if he had an opinion as to whether a murder and four attempted murders under the described circumstances were committed for the benefit of, at the direction of or in association with a Maywood Locos gang member. Serrata answered affirmatively. He explained that by asking party goers what gang they are from while displaying a gun, a gang member instills fear of the gang into the object of his inquiry as well as all witnesses to the exchange. By repeating the question to the people waiting to get into the party, and then shooting at them, the gang member compounds that fear. Word of the incident spreads throughout the neighborhood, instilling fear of the shooter and his gang into the community. Under *Vang, supra*, 52 Cal.4th at page 1048, the prosecutor's hypothetical was not improper.

Defendant also argues that the hypothetical was so lengthy that it essentially allowed the prosecutor to argue its case in the guise of asking a question. Although we can imagine a hypothetical that could improperly have that effect, this hypothetical did not. We conclude that there was no abuse of discretion in allowing the expert to answer the challenged hypothetical.

D.     *Substantial Evidence Supported the Premeditation Finding*

Defendant contends insufficient evidence supports the finding that the murder was premeditated. He argues that the only reasonable inference from the evidence is that the killing was the spontaneous result of a sudden confrontation. We disagree.

"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) Known as the "*Anderson* factors," three types of evidence are generally relied upon to support a finding of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing. (*People v. Welch* (1999) 20 Cal.4th 701, 758, overruled on another point in *People v. Blakeley* (2000) 23 Cal.4th 82, 91, citing *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).) Typically, a finding of premeditation is supported by substantial evidence when there is evidence of all three types, extremely strong evidence of planning, or evidence of motive and manner of killing. (*Welch*, at p. 758.) Evidence that the defendant deliberately aimed at the victim believing he was a rival gang member is sufficient to support a premeditation finding. (*People v. Rand* (1995) 37 Cal.App.4th 999, 1001.)

Here, the premeditation finding was supported by substantial evidence of motive and manner of killing. In particular, we find substantial the evidence that defendant fired at Bryan multiple times from close range after asking him the portentous question, "Where are you from?," Andy's testimony that defendant shot at Bryan after Bryan identified himself as a member of the Orchard Locos, and the gang expert's testimony that the Maywood Locos considered the Orchard gang to be rivals.

15

*E.     Defendant's Sixth Amendment Rights Were Not Violated by Imposition of Various Fines*

We find no merit to defendant's contention that imposition of fines and restitution payments totaling $12,936 violated *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and its progeny.

In *Apprendi*, the United States Supreme Court held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. (*Apprendi, supra,* 530 U.S. at p. 490.)  In *Southern Union Co. v. U.S.* (2012) __ U.S. __ [132 S.Ct. 2344, 2357] (*Southern Union Co.*), the court held that the rule applied equally to imposition of criminal fines.

In *People v. Kramis* (2012) 209 Cal.App.4th 346, 351 (*Kramis*), our colleagues in Division Five held that *Apprendi* and *Southern Union Co.* do not apply when the trial court exercises its discretion within a statutory range, as it does when selecting a restitution fine pursuant to Penal Code section 1202.4, subdivision (b).  The court explained that *Apprendi* " 'distinguishes a "sentencing factor" – a "circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense" —from a "sentence enhancement" — "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict" constituting "an increase beyond the maximum authorized statutory sentence." [Citation.]' [Citation.]" (*Kramis, supra,* at p. 351, citing *People v. Urbano* (2005) 128 Cal.App.4th 396, 405-406.)  In *People v. Pangan* (2013) 213 Cal.App.4th 574, 585 (*Pangan*), the court held that neither *Apprendi* nor *Southern Union Co.* applied to direct victim restitution, "because direct victim restitution is not a criminal penalty.  As explained in *U.S. v. Behrman* (7th Cir. 2000) 235 F.3d 1049, 1054, direct victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits.  It is not increased 'punishment.' [*People v. Millard* (2009) 175 Cal.App.4th 7, 35] makes the same point in regard to California law.  [Citations.]

16

[*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1184] has collected the numerous federal cases also holding victim restitution does not constitute increased punishment for crime.  [Citation.]  And we would note the restitution statute *itself* characterize [sic] victim restitution awards as civil.  (See § 1202.4, subd. (a)(3)(B) [victim restitution 'shall be enforceable as if the order were a civil judgment'].)"

We agree with the reasoning of the court in *Kramis* and *Pangan*.  Under *Kramis*, defendant was not entitled to a jury trial on the fines imposed pursuant to Government Code section 70373 or Penal Code sections 1465.8, 1202.4, subdivision (b) or 1202.45 because those fines were within a range prescribed by statute.  He was not entitled to a jury trial on the $3,686 restitution award to Bryan's surviving family and the $8,380 to the state victims' restitution fund because direct victim restitution is not increased punishment.

## DISPOSITION

The judgment is affirmed.


RUBIN, ACTING P. J.

WE CONCUR:


FLIER, J.


GRIMES, J.


17